**PACIFIC GREAT LAKES CORPORATION, Appellant and Cross–Appellee,**

**v.**

**BESSEMER & LAKE ERIE RAILROAD, Appellee and Cross–Appellant.**

[Cite as *Pacific Great Lakes Corp. v. Bessemer &
Lake Erie RR.* (1998), 130 Ohio App.3d 477.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 70394.

Decided Nov. 9, 1998.

478

480

**482**

*Rademaker, Matty, McClelland & Greve* and *Robert C. McClelland*; *Howrey &
Simon, Basil C. Culyba, Jerrold J. Ganzfried, Thomas E. Gilbertsen, Robert C.
Green, Fabrizio Rasetti* and *Robert F. Ruyak*, for appellant and cross-appellee.

*Squire, Sanders & Dempsey, Thomas S. Kilbane, Stacy D. Ballin, Micah
Green, David Lavey* and *Damond R. Mace*, for appellee and cross-appellant.

KARPINSKI, Judge.

This appeal and cross-appeal are the most recent, but apparently not the last,
in a series of antitrust actions involving the iron ore transportation industry in
the lower Great Lakes region.[1] The case stems from claims that several

---

1. The record reveals that there may be at least two other pending cases involving this matter.
 Our opinion is limited solely to the particular facts and circumstances of this case, and we
 express no opinion concerning the application of these principles in any other cases.

railroads, all of which were members of an approved Interstate Commerce Commission ("ICC") rate bureau, conspired to prevent alternative transportation of iron ore to inland steel mills.

## Introduction

Bessemer & Lake Erie Railroad ("Bessemer") and several other railroads operating in northern Ohio were members of the Coal, Coke and Iron Ore Committee ("CCIOC"), an ICC-approved railroad rate bureau, in the once heavily regulated railroad industry. Eastern Railroads—Agreements, 277 I.C.C. 279 (1950). Cleveland Stevedore, n.k.a. Pacific Great Lakes Corp. ("Cleveland Stevedore"), provided cargo handling services for ships and was lessee of Dock 20 in Cleveland and a contract operator of the Huron Ore Dock under agreements with two other railroads. Bessemer operated a rail line from a dock, owned by a separate subsidiary of U.S. Steel, in Conneaut, Ohio, to Bessemer, Pennsylvania, north of Pittsburgh.

Cleveland Stevedore alleged that Bessemer and other members of the CCIOC entered into a separate agreement outside the scope of the permitted rate-bureau scheme, to preclude its entry or expansion into the business of handling iron ore at Lake Erie docks by using the innovative technology of self-unloading vessels. It argued that the railroads sought to monopolize the transportation of iron ore and concertedly refused to deal with it in violation of the Ohio Valentine Act, R.C. 1331.01 et seq. It alleged various exclusionary practices by the railroads, including (1) refusing to sell or grant an unrestricted lease on Dock 20 or the Huron Ore Dock, (2) refusing to remove a lease restriction against using Dock 20 for handling iron ore, (3) refusing to accept self-unloading vessels at docks owned by the railroads, and (4) terminating its agreement to operate the Huron Ore Dock.

Following a lengthy trial, the jury returned a verdict finding that Bessemer was not "a material cause of injury in fact to the business or property of" Cleveland Stevedore and awarded no damages. Cleveland Stevedore appeals from the judgment on the jury verdict and denial of its motion for new trial on its antitrust claims under the Valentine Act.[2] Bessemer cross-appeals from various

---

2. Cleveland Stevedore filed a notice of appeal from the trial court's judgment on the jury verdict before the court denied its timely motion for judgment notwithstanding the verdict or new trial. Cleveland Stevedore did not file a separate notice of appeal from the denial of its motion for new trial. Bessemer filed a motion to dismiss the appeal in part on the grounds that Cleveland Stevedore did not appeal from the denial of its motion for new trial. The motion was referred to the merits panel for disposition.

During the course of the appeal, a motion panel of this court granted Cleveland Stevedore's motion to amend its notice of appeal to challenge the denial of its motion for new trial. As a result, that portion of Bessemer's motion to dismiss the appeal for failing to appeal the denial

adverse rulings.[3] Because we find no reversible error, we affirm the trial court's judgment on the jury verdict and decline to address the arguments raised by Bessemer. See *Pang v. Minch* (1990), 53 Ohio St.3d 186, 199–200, 559 N.E.2d 1313, 1325–1326.

## Background

Antitrust litigation involving the iron ore transportation industry began nine years before this action was filed. Bessemer and several other railroads pleaded *nolo contendere* to a federal criminal charge of unlawful restraint of trade under Section 1 of the Sherman Act, Section 1, Title 15, U.S. Code. The case did not include either charges of monopolization or charges under Ohio's counterpart, the Valentine Act. Affirming Bessemer's conviction and fine, the federal Court of Appeals for the District of Columbia rejected Bessemer's railroad-regulated industry defenses, one of which was that their conduct was immune. *United States v. Bessemer & Lake Erie R.R. Co.* (C.A.D.C.1983), 717 F.2d 593. The conspiracy to prevent alternative transportation from developing began "as early as 1956" and comprised nine specific acts. In its opinion the D.C. Circuit Court summarized the conspiracy as follows:

"The anticompetitive activity prosecuted here arises not from the formation of the rate bureau, but from the response of the members of the rate bureau to a technological innovation in carrying iron ore across the Great Lakes. At the time the rate bureau was formed, ships known as 'bulkers' transported virtually all iron ore to Lake Erie docks in an unprocessed, mud-like form. The bulkers were unloaded by heavy cranes, the most common of which were called 'huletts.' A hulett unloads ore from the hold of a ship using a clamshell-like claw that dips into the ship, grabs a load of iron ore, and carries it to the dock. The ore may either be loaded directly into waiting rail cars or moved to storage.

"The railroads owned the unloading facilities and docks used to service the huletts. In addition to publishing charges for transporting the ore, the railroads published a series of charges for unloading the ore from the freighters. The structure of these rates reflected an expectation that huletts would be used to unload the bulkers.

"In the early 1950's a new technology developed for 'pelletizing' the ore into high-grade pellets the size of marbles. This new technology made it possible to

---

of the motion for new trial was rendered moot. The remainder of Bessemer's motion, which sought to dismiss Cleveland Stevedore's challenge to the denial of a pretrial motion for summary judgment, was not supported by any authority showing that dismissal was appropriate. For these reasons, Bessemer's motion to dismiss the appeal is hereby denied.

**3.** See Appendix.

ship the ore in vessels called 'self-unloaders,' which can discharge their cargo through use of a conveyor belt system that is built into the vessel. Since the self-unloaders can lift the ore to deck level and drop it onto the dock, they eliminated the need for huletts or similar dock unloading equipment.

"The new pelletization technology threatened to render obsolete the substantial investment the railroads had made in huletts and other unloading facilities. In addition, the new technology created the prospect that private docks not equipped with huletts—which had been unable to compete for the business of unloading bulkers—could now compete for the business of self-unloaders." *Id.* at 596.

The claims relating to private docks include both competition from existing private nonrailroad docks and potential competition from docks by new entrants.

■ Following the criminal judgments, a series of private civil antitrust actions were filed against railroad members of the CCIOC seeking to recover multiple damages under Sections 1 and 2 of the Sherman Act, the Clayton Act, and the Valentine Act. Section 1, 2, and 15, Title 15, U.S.Code; R.C. 1331.01 *et seq.* To recover in such private antitrust actions, the claimant must prove, in addition to proving an underlying violation of antitrust law, injury to its "business or property," and damages resulting from the anticompetitive consequences of the antitrust violation. The cases raising these antitrust claims against the CCIOC member railroads arising from the transportation of iron ore have reached differing results.

The first actions involved two parties specifically named as victims of the conspiracy in the federal criminal indictments and sought to recover damages from the beginning of the alleged conspiracy in "the mid 1950s." Pinney Dock actually owned and operated a private nonrailroad dock, and Litton Industries was a shipbuilder during the period. In an interlocutory appeal the Sixth Circuit recognized, contrary to *United States v. Bessemer, supra,* that certain railroad-regulated industry defenses applied to bar federal and state antitrust claims concerning certain of the alleged railroad misconduct, and remanded the remaining claims for further proceedings. *Pinney Dock & Transport Corp. v. Penn Cent. Corp.* (C.A.6 1988), 838 F.2d 1445.

A series of other federal actions filed by five steel companies, three other private nonrailroad dock companies, and three trucking companies was consolidated by the federal judicial panel for multidistrict litigation and tried in a single proceeding ("MDL 587"). The federal and state antitrust claims in MDL 587 spanned the period after 1968, unlike the claims in *Bessemer* and *Pinney Dock,* which were from the 1950s before expansion of the Poe Lock made possible the

use of larger more economical vessels. Cleveland Stevedore did not join as a party in the MDL 587 litigation.

The consolidated MDL 587 cases reached mixed results. The steel companies and two of three dock companies ultimately prevailed at trial against Bessemer. The judgment was affirmed on appeal in all respects except that the award of nominal damages to one of the two dock companies was reversed and its claim relating to one of its two docks was remanded for a new trial on damages. *In re Lower Lake Erie Iron Ore Antitrust Litigation* (E.D.Pa.1991), 759 F.Supp. 219, affirmed in part and reversed in part (C.A.3, 1993), 998 F.2d 1144, certiorari denied sub. nom. *Bessemer & Lake Erie RR. Co. v. Wheeling–Pittsburgh Steel Corp.* (1994), 510 U.S. 1091, 114 S.Ct. 921, 127 L.Ed.2d 215. Declining to follow *Pinney Dock,* the federal district and appellate courts rejected Bessemer's railroad-regulated industry defenses concerning immunity from certain antitrust claims. The United States Supreme Court denied certiorari to clarify the application of the antitrust laws in the context of the regulated railroad industry.

## The Instant Action

After the MDL 587 verdicts, Cleveland Stevedore filed this action in the Cuyahoga County Common Pleas Court on May 9, 1990. Cleveland Stevedore seeks to recover damages under the Valentine Act for past and future profits allegedly lost commencing in 1959 before the expansion of the Poe Lock. Cleveland Stevedore argued that the railroad conspiracy prevented it from entering or expanding into this line of business.

As a matter of historical fact, during Cleveland Stevedore's operations only one vessel of iron ore pellets was unloaded on Dock 20 in 1954, and only three vessels of iron ore pellets were unloaded at the Huron Ore Dock in 1968. A central issue was whether, under the particular circumstances facing Cleveland Stevedore beginning in the mid 1950s, it had the intent and preparedness to finance, construct, and operate the facilities necessary for a private dock to handle pelletized iron ore from self-unloading vessels.

The trial court denied Cleveland Stevedore's request to invoke collateral estoppel against Bessemer. The argument was based on the jury verdicts in MDL 587, which awarded recovery only to certain litigants and only for the more limited period beginning in 1968. The matter proceeded to a ten-week jury trial, with testimony from approximately thirty witnesses, a transcript of 7,350 pages, and more than one thousand exhibits. Prior to submitting the case to the jury, the trial court conducted a lengthy jury-charge conference over a three-day period. This conference occurred in the judge's chambers and was off the record.

The jury returned a unanimous general verdict in favor of Bessemer. In answers to interrogatories, the jurors specifically found that an unlawful conspir-

acy existed, in which Bessemer knowingly participated, but that the conspiracy was not "a material cause of injury in fact to the business or property of" Cleveland Stevedore. Because of this finding that the challenged conduct caused no injury, no damages were recoverable under the Valentine Act. The trial court denied Cleveland Stevedore's motion for judgment notwithstanding the verdict or new trial.

On appeal Cleveland Stevedore challenges four of the trial court's jury instructions, its refusal to give preclusive effect to the prior federal court judgment in MDL 587, and its admission of certain expert opinion testimony.

I

Cleveland Stevedore's first assignment of error follows:

"The trial court's failure to grant appellant's motion for a new trial constitutes reversible error."

This assignment lacks merit.

Cleveland Stevedore argues that the trial court improperly instructed the jury in this case in three specific areas.[4] First, it argues that the trial court improperly instructed the jury that it was required to prove all its claimed damages before it could find any injury in fact, particularly in its instructions on Cleveland Stevedore's intent and preparedness. Second, it argues that the trial court improperly instructed the jury that it was required to make a firm demand to lease or purchase the railroad docks to satisfy its claims for concerted refusal to deal. Finally, it argues that the trial court improperly required it to prove injury from particular overt acts of the conspiracy rather than permitting it to infer injury from the conspiracy as a whole. Cleveland Stevedore seeks reversal and remand for a new trial limited to causation and damages.

Initially, we find, contrary to Bessemer's argument, that Cleveland Stevedore sufficiently objected to the trial court's instructions in this case to consider its claims of error. Civ.R. 51(A). The record shows that each party submitted a lengthy set of proposed instructions. Over the course of three days, the trial court in chambers and without a court reporter subsequently conducted a conference concerning its proposed instructions and jury interrogatories. Following the conference, Cleveland Stevedore compiled and filed two sets of

---

4. In its appellate brief Cleveland Stevedore narrowed this assignment. Its brief challenges only the trial court's instructions, but its motion for new trial raised additional issues. Because Cleveland Stevedore does not separately argue each aspect of its motion for new trial under this assignment of error, we deem the omitted arguments to be waived for purposes of this assignment.

supplemental instructions. The trial court further refined certain of the supplemental instructions.

Prior to delivery of the final instruction to the jury, Cleveland Stevedore objected on the record to the instructions it challenges on appeal. At that time, Cleveland Stevedore specifically stated as follows: "Both parties reserve the right to object to those instructions which either they sought and were not a part of the final jury charge or were objected to and included in the final jury charge."

Bessemer argues that Cleveland Stevedore waived its objections by not objecting with sufficient specificity and by submitting as its own the supplemental instructions that provided the basis for the trial court's final instructions. Cleveland Stevedore counters, however, that it merely transcribed the revisions to its initial proposed instructions to implement the trial court's rulings from the charge conference. Moreover, it provided the transcription of the instructions solely as a courtesy for the visiting judge, who lacked staff for the task.

Pursuant to App.R. 9(E), we previously remanded the matter to the trial court to supplement the record on this point, but the trial judge concluded that he was unable to do so. The record unambiguously reveals, however, that the second set of supplemental instructions at issue embodied part of each party's original proposed instructions. Although the trial court ultimately deleted further language from these supplemental instructions before delivering them, the principal instruction challenged on appeal was taken verbatim from Bessemer's original proposed instructions. The record shows that Cleveland Stevedore proposed various instructions, objected to certain instructions given, and did not clearly approve of the trial court's final instructions. Under the circumstances, we are unable to find that Cleveland Stevedore waived its objections.

## A. Background

From a total of ninety pages of instructions at the conclusion of the case, Cleveland Stevedore challenges four instructions. A general defect runs through its arguments. It is well established, contrary to these arguments, that a reviewing court must consider jury instructions in their entirety, not in isolated portions. *Kokitka v. Ford Motor Co.* (1995), 73 Ohio St.3d 89, 652 N.E.2d 671, citing *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 210, 24 O.O.3d 316, 317–318, 436 N.E.2d 1001, 1003–1004. Any ambiguity in a selected portion of the instructions does not constitute reversible error unless the instructions, as a whole, are so misleading as to prejudicially affect a substantial right of the complaining party. *Id.*

This principle applies particularly in the case at bar because the trial court repeatedly instructed the jury, two times each in its instructions delivered orally and again in writing, that the jurors must consider the instructions in their

entirety. At the outset of its instructions, the trial court specifically instructed the jury as follows:

"You are not to single out any one instruction alone as stating the law. You must consider the instructions in their entirety."

Then at the conclusion of its instructions, the trial judge again instructed the jury as follows:

"I cannot embody all the of [sic] law in any single part of these instructions. In considering one portion, you must consider it in the light of and in harmony with all the instructions."

Cleveland Stevedore's arguments generally require construing selected portions of the instructions in a manner inconsistent with the broad tenor of the court's instructions.

### B. Instructions Regarding Injury

█ Cleveland Stevedore's basic theme is that the trial court improperly instructed the jury that Cleveland Stevedore was required to prove all its claimed *damages* before the jury could find causation of any *injury* in fact to its "business or property."[5] However, in portions of the trial court's instructions preceding the challenged instruction, the trial court clearly and properly separated the element of injury from the extent of damages by instructing the jury as follows:

"The law provides that any person who is injured by an antitrust violation may recover damages for in jury [sic] to its business or property caused by the violation.

"For Cleveland Stevedore to establish that it is entitled to recover damages, it must prove that it was injured as a result of the alleged violation of the antitrust laws. This is sometimes referred to as proving causation, the fact of injury, or impact. *Proving causation, fact of injury or impact does not require Cleveland Stevedore to prove the dollar value of its injury.* Its [sic] requires that Cleveland Stevedore prove that it was, in fact, injured by the alleged antitrust violation.

"* * *It is important to understand, however, that injury and amount of damage are different concepts* and that you cannot consider the amount of damage unless and until you have concluded that plaintiff has established that it was in fact injured.

"To establish injury, Cleveland Stevedore must have offered evidence which establishes as a matter of fact and with a fair degree of certainty that the alleged

---

5. The argument that a party was required to prove damages to establish any injury is similar to one the Twelfth District Court of Appeals rejected in *Williams v. Oeder* (1995), 103 Ohio App.3d 333, 342, 659 N.E.2d 379, 384–385. As in *Williams,* the instructions in the case at bar do not constitute reversible error. They did not improperly require proof of enhanced injury to satisfy the requirement of injury or confuse the existence of injury with resulting damages.

illegal conduct was a material cause of plaintiff's injury. *This means that plaintiff must have proved that some damage flowed to it as a result of the alleged antitrust violation.* * * *

"The Valentine Act requires that a plaintiff establish that the injury it claims to have suffered was an injury to its 'business or property.' *The term 'business' includes any commercial interest or venture,* and you are instructed that a plaintiff has been injured in its 'business' if you find that it has suffered injury to any of its commercial interests or enterprises as a result of the alleged antitrust violation." (Emphasis added.)

These instructions were taken verbatim from Cleveland Stevedore's original proposed instructions and the supplemental instructions.

Later, the court again instructed the jury:

"If you find that Cleveland Stevedore had the intent to enter the iron ore business and had taken steps to prepare to do so, then it has satisfied the 'business or property' requirement."

During its instructions on the law of damages, the trial court again expressly recognized the distinction between the element of injury, also known as the fact of damage, and the extent of damages:

"In other words, the law recognizes a distinction between the greater measure of proof necessary to establish the fact that a plaintiff has suffered some damage [*i.e.* injury], and the lesser measure of proof necessary to fix the amount of that damage."

Cleveland Stevedore also contends that, to establish the existence of any injury, the court improperly required it to prove that it would operate both Dock 20 and the Huron Ore Dock in the time and manner claimed. If the above-quoted instructions were not otherwise sufficient to dispel this contention, however, there were further actions the trial court took that had this effect. The trial court also prepared interrogatories and specifically advised the jury that the two dock projects were separate for purposes of concluding whether Cleveland Stevedore had proven any injury.

It is well established that jury interrogatories can cure any ambiguity or error in jury instructions. *Reitz v. Howlett* (1995), 106 Ohio App.3d 409, 666 N.E.2d 296. Interrogatories Four and Five specifically negate Cleveland Stevedore's argument that it was required to prove claims regarding both docks to establish any injury, because they were separate interrogatories for separate injuries relating to Dock 20 and Huron Ore Dock.[6] Although the jury did not

---

**6.** The trial court took the first three special interrogatories verbatim from Cleveland Stevedore's proposed interrogatories. However, from Bessemer's proposed interrogatories the

complete these two final interrogatories, because it found under the third interrogatory that the conspiracy was not a material cause in fact of any injury to the business or property of Cleveland Stevedore, the court explained the final two interrogatories to the jury. That explanation sufficiently highlighted the distinction between the existence of an injury and the extent of damages. Under the circumstances, the jury was not misled into believing that Cleveland Stevedore had to prove all its damages before it could establish any injury.

### C. Instructions on Intent and Preparedness

 Cleveland Stevedore also complains about the specific instructions on intent and preparedness. As we noted above, to recover for an antitrust violation, a private antitrust plaintiff must show, in addition to the violation, that it was injured "in its business or property" by the anticompetitive effects of the violation. Section 4, Title 15, U.S.Code; R.C. 1331.08.[7] Isolating such harm caused by antitrust violations is complicated in cases involving existing businesses in the particular field, but is even more difficult in cases involving potential businesses that allege the loss of a business opportunity by preventing entry or expansion into a new market. To recover under such circumstances, the claimant must show that it both intended to enter the market and was prepared to do so within a reasonable time. 1 ABA Section on Antitrust Law, Antitrust Law Developments (4 Ed.1997) 760-764 and 782-785, Chapter X, Sections C.1. and E; 2 Areeda & Hovenkamp, Antitrust Law (Rev. Ed.1995) 292–296, Paragraph 374; 5 Kintner, Federal Antitrust Law (1984) 11-13, Section 39.6.[8]

---

court added an injury element to the remaining two interrogatories submitted to the jury. Interrogatory 4A asked, "Was the agreement, combination or conspiracy a material cause of injury to the business or property of Pacific Great Lakes/Cleveland Stevedore at Dock 20?" Interrogatory 5A repeated the question, but substituted "at Huron?" for "at Dock 20?" Stating these separate injury elements separately for each dock eliminated any argument that Cleveland Stevedore was required to prove its claims concerning both docks to establish the existence of any injury. Interrogatories 4B and 5B further clarified the matter by inquiring as to the year when each respective injury first occurred. Finally, Interrogatories 4C and 5C specifically inquired about the compensatory damages for each injury.

7. The Ohio Valentine Act was patterned after the federal Sherman Antitrust Act and has been interpreted in light of federal judicial constructions of that Act. *C.K. & J.K., Inc. v. Fairview Shopping Ctr.* (1980), 63 Ohio St.2d 201, 204, 17 O.O.3d 124, 126, 407 N.E.2d 507, 508–509; *Schweizer v. Riverside Methodist Hospitals* (1996), 108 Ohio App.3d 539, 671 N.E.2d 312. Although we likewise cite and discuss federal cases, we expressly limit our holding to Ohio law.

8. At the conclusion of the trial, Cleveland Stevedore sought to avoid this requirement and broaden its antitrust claims when it contended it was already engaged in the business because of the four shipments of iron ore pellets that it handled. Although its complaint did not present this claim, and the trial court instructed the jurors at the outset of the case to the contrary, the final instructions embraced this theory. The jury was specifically instructed as

There are no hard and fast rules to determine exactly what factors should be considered or when these conditions have been satisfied, and the evaluation must be tailored to the facts and circumstances of each case. The purpose of the intent-and-preparedness standard is to encourage enforcement of the antitrust laws by identifying highly motivated entrepreneurs who would have entered the market if no antitrust violation had occurred.

The key to determining whether an alleged potential competitor has a sufficient interest protected by the antitrust laws is whether it demonstrates that it both intended and was prepared to compete in a particular market. As noted above, establishing this logical threshold predicate of the existence of an injury is distinct from the issue of any resulting damages. This inquiry as to standing focuses on the steps taken by the claimant to enter the industry and thus to set it apart from the rest of the general public, rather than on the possibility that profit will exceed loss once it has embarked on the business. The claimant must provide more than a speculative basis that it would have entered the business if the antitrust violation had not occurred.

The trial court's general instructions on the intent-and-preparedness requirement were lenient:

"[P]laintiff must prove that it had an intention to enter into business or expand an existing business into such a new market *and had taken steps to prepare to do so.*" [9] (Emphasis added.)

Additionally, the trial court thereafter delivered the standard instruction concerning intent and preparedness as follows:

"In deciding whether Cleveland Stevedore has shown that it had the necessary intent and preparedness to enter the proposed businesses, you *may* consider such factors as: [1] The background and experience of the principals and employees of plaintiff; [2] the ability of plaintiff to finance the business and to purchase the necessary facilities and equipment; [3] affirmative steps taken by plaintiff to enter this new business; *and* [4] so forth." (Emphasis and bracketed numerals added.)

---

follows: "If you determine that Cleveland Stevedore's alleged injury was to its ongoing business or the mere growth in an ongoing business, no intent and preparedness showing is required." If the jury accepted Cleveland Stevedore's argument that it was an existing business in the iron ore transportation field, any error on the intent and preparedness instruction would be irrelevant because Cleveland Stevedore would not have been required to establish this element.

9. See, also, the court's concluding instructions, which contained the same phrasing of this requirement, quoted above.

This latter instruction was taken verbatim from Cleveland Stevedore's original and supplemental instructions and from the ABA Section on Antitrust Law, Sample Instructions in Civil Antitrust Cases (1990) at F–23. In applying these principles to the particular circumstances of this case, however, the trial court added an additional sentence from the supplemental instructions filed by Cleveland Stevedore and from Bessemer's original proposed instructions:

"To establish intent and preparedness, Cleveland Stevedore *must* prove that (1) it had an actual intention to enter into the self-unloader iron ore dock business; (2) Cleveland Stevedore took substantial, concrete and affirmative steps to acquire and develop each of the docks claimed at the times claimed[;] (3) it was prepared to acquire and develop each of the two docks at the times and in the manner it now claims; (4) it had an actual plan to do so; *and* (5) its plan was reasonably likely to succeed absent the alleged conspiracy." (Emphasis added.)

Cleveland Stevedore challenges this rephrasing of the intent-and-preparedness criteria and argues that it impermissibly transforms the standard into a strict five-part test by breaking the standard into five components rather than the four set forth in the standard instruction.

Initially, we note that Cleveland Stevedore ignores the basic general instruction and has not objected to any potential ambiguity between it and the subsequent instruction. The Supreme Court of Ohio has held that even when such an objection is made, however, "[a] jury instruction must be considered in its entirety and, ordinarily, reversible error does not consist of misstatements or ambiguity in a part of the instruction." *Sech v. Rogers* (1983), 6 Ohio St.3d 462, 464, 6 OBR 515, 517, 453 N.E.2d 705, 707.

Of the "five-part test," Cleveland Stevedore's argument does not specifically challenge three elements: the first, actual intent; the fourth, actual plan; or the fifth, reasonable likelihood of success. Rather, the argument focuses on the second, affirmative steps; and the third, preparation to acquire. As held above, however, Cleveland Stevedore's principal argument that these latter two elements require it to prove all its damages to prove any injury, by showing that it would have developed both docks, lacks merit. See Section IB above.

The second element—affirmative steps—of the five-part test simply reiterates the affirmative-steps requirement of the four-part standard proposed by Cleveland Stevedore. The third element—preparation—of the five-part intent-and-preparedness instruction is circular and does not impose any independent substantive condition. Nor is Cleveland Stevedore's objection that the instruction contained five elements rather the four persuasive.

In *Great W. Directories, Inc. v. Southwestern Bell Tel. Co.* (C.A.5, 1995), 63 F.3d 1378, 1389, the Fifth Circuit rejected a challenge similar to the one made by

Cleveland Stevedore. The court stated that "[w]hile we do not hold that every plaintiff in every case must show all four of the factors to merit standing, we find Great Western's showing to be insubstantial."

We believe that similar principles warrant rejecting Cleveland Stevedore's argument. It takes quite a stretch to argue that the jury verdict against Cleveland Stevedore resulted from the trial court's use of this latter instruction in more than ninety pages of instructions. The instructions in the MDL 587 litigation, which resulted in a verdict against Bessemer, also contain similar mandatory language and listing of factors. The MDL 587 court stated as follows:

"The liability jury was instructed that to find for all plaintiffs here they *must* determine that:

"[T]he particular plaintiff * * * was genuinely interested in doing it, it requested the transaction, *and* was financially able to carry it out. * * * You can't claim to have been damaged unless you were genuinely damaged, and you can't be genuinely damaged unless if the [*sic*] [private docks] had been willing and would have been in a position and would have carried it through." (Emphasis added; bracketed phrase *sic;* footnote omitted.) *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d at 1182.

Specifying five factors rather than four as in the standard instructions or three factors as in MDL 587 did not require any greater proof because the factors were substantively cumulative and overlapping.

The trial court gave the standard instructions. Particularizing the abstract intent-and-preparedness criteria into several components did not heighten the burden of proving intent and preparedness in this case. Under the circumstances, Cleveland Stevedore has failed to show reversible error.

### D. Instructions on Demand

Cleveland Stevedore also argues that the trial court improperly instructed the jury that Cleveland Stevedore was required to prove that it made a "firm demand" to purchase or lease Dock 20 or the Huron Ore Dock to establish its claim for concerted refusal to deal. Cleveland Stevedore contends there was uncontroverted evidence that such a request would have been futile as indicated by the parties' course of dealings, and thus Cleveland Stevedore was excused from the requirement of making it.[10] We disagree.

The parties vigorously disputed these issues, and the record shows the existence of factual disputes concerning both the sufficiency of demand and the

---

**10.** Cleveland Stevedore makes a similar argument concerning its claim of the concerted refusal to remove the restriction on using Dock 20 to unload iron ore, although it never requested an instruction on futility concerning this claim.

existence of futility. The trial court would have committed error by accepting Cleveland Stevedore's argument and not instructing the jury concerning the party's competing claims.

The challenged instruction follows:

"In order to recover damages from an alleged concerted refusal to deal, Cleveland Stevedore must establish that it was genuinely interested in and had an actual intention to lease or purchase the docks it claims damages for to establish a self-unloader iron ore facility. It is not enough just to be engaged in that business. Obviously, if it were otherwise, every dock company in the entire country could claim damages because the railroads refused to sell or lease land to a private dock. In order to establish damages, Cleveland Stevedore must show it tried to get the property, that it made an actual demand or a request for such as a purchase or lease, that it was interested in setting up the business and that it had the financial ability to do it. It also must appear that Cleveland Stevedore was making a reasonable proposal. The offer to deal by Cleveland Stevedore must be a reasonable one under the circumstances, one which in the normal course of events you would think would have been accepted but for the conspiracy."

 Generally, some form of a request to deal must come before one can infer a refusal to deal. In fact, as noted above, the challenged instruction in the case at bar is similar to that in the MDL 587 cases, which arose from precisely the same claims and required the plaintiff private dock owners to have "requested the transaction." *In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d at 1182. Under the circumstances, the trial court was not required to excuse such a demand in this case as a matter of law.

Instead, the trial court properly submitted to the jury the factual issue of the sufficiency of the demand and whether the demand was excused as futile. In this matter, the trial court properly provided the above instruction and the following futility instruction, which is similar to what Cleveland Stevedore sought in its first set of supplemental instructions:

"Cleveland Stevedore must prove that any claimed request was clearly refused in furtherance of a conspiracy or pursuant to mutual agreement among the particular railroad and Bessemer, and not the result of the railroad's independent business judgment. If you find that Cleveland Stevedore has shown that it took concrete and affirmative steps to conduct the business it claims it was foreclosed from, then in determining if Cleveland Stevedore has demonstrated a refusal to deal, you may consider whether further steps were not taken because of a conclusion by Cleveland Stevedore that such efforts would have been futile or a

sheer waste of resources. The law does not require a plaintiff to make futile additional demands."

The jury was instructed that if it found Cleveland Stevedore had taken concrete steps to conduct the business, no further request of any kind to purchase or lease the docks was necessary and the jury could conclude that no further steps were taken because they would have been futile. Under the circumstances, the trial court properly instructed the jury concerning the parties' competing contentions without unduly emphasizing either of them. Cleveland Stevedore has failed to show reversible error in the trial court's instructions concerning its claim of a concerted refusal to deal.

### E. Instruction on Injury from Conspiracy

Cleveland Stevedore's remaining argument that the trial court improperly required the jury to find injury from acts in furtherance of the conspiracy, rather than from the conspiracy in general, lacks merit. It is well established that the law does not look to a conspiracy in a vacuum to determine injury, but instead looks to overt acts of the conspiracy to determine whether it caused any injury. *Fed. Prescription Service, Inc. v. Am. Pharmaceutical Assn.* (C.A.D.C.1981), 663 F.2d 253, 268–269. Under the circumstances, Cleveland Stevedore has not shown any error in the trial court's instructions that injury must come from acts in furtherance of the conspiracy.[11]

Accordingly, Cleveland Stevedore's first assignment of error is overruled.

### II

Cleveland Stevedore's second assignment of error follows:

"The trial court's failure to grant PGLC's [Cleveland Stevedore's] motion to apply collateral estoppel constitutes reversible error."

This assignment lacks merit.

Cleveland Stevedore argues that the trial court improperly declined to invoke the doctrine of collateral estoppel to preclude Bessemer from relitigating certain issues raised by other parties against it in the MDL 587 litigation. Specifically, Cleveland Stevedore sought to make offensive use of nonmutual collateral estoppel from the MDL 587 litigation on the following six points: (1) a conspiracy

---

**11.** We specifically reject Cleveland Stevedore's reliance on *Affiliated Capital Corp. v. Houston* (C.A.5, 1984), 735 F.2d 1555, which is its most favorable appellate case. *Affiliated Capital* made a stronger showing than Cleveland Stevedore that it was prepared to enter the market and had taken more steps to enter. *Affiliated's* exclusion from a government-franchised local cable television monopoly, moreover, provides a much stronger basis to infer resulting injury than the alleged exclusion in the case at bar.

existed to prevent competition in transporting iron ore, (2) Bessemer knowingly participated in the conspiracy, (3) Bessemer's participation was not undertaken in a good-faith belief that it was permitted by the ICC, (4) Bessemer's participation was not reasonable, (5) the conspiracy caused delay in the development of private docks, and (6) the conspiracy foreclosed or delayed the development of self-unloading vessels.[12]

The parties spend considerable time discussing whether mutuality is required before collateral estoppel can apply in a particular case. However, it is well established that the doctrine does not apply unless the identical issues were actually and necessarily litigated and determined in a prior action. The record in this case reveals this basic requirement is not satisfied, because the issues in the MDL 587 litigation and this action arose in part in different time periods and, therefore, are not sufficiently "identical" to mandate application of collateral estoppel.

*First Natl. Bank of Cincinnati v. Berkshire Life Ins. Co.* (1964), 176 Ohio St. 395, 27 O.O.2d 360, 199 N.E.2d 863, provides an excellent example of the application of this principle. *First Natl. Bank* involved an action filed by a bank against a life insurance company to collect death benefits on two separate life insurance policies issued twenty-six days apart. The insurance company alleged that the policies were invalid because the insured misrepresented that he was in good health when the policies were issued. The bank sought to invoke collateral estoppel based on a prior judgment against the insurance company which found that the insured was in good health in connection with a third identical insurance policy issued to him on the same date as the later of the two policies claimed by the bank.

Reversing the appellate court, the Supreme Court of Ohio held that the issues in the two cases were not identical to warrant invoking collateral estoppel based on the first judgment. The good health of the insured as to the first policy, issued March 16, 1955, was not at issue in the prior case involving the third policy issued one month later on April 11, 1955. The court recognized that the issue concerning the insured's good health as to the second policy of April 11, 1955 was the same as that regarding the third policy with the same date. The court, nevertheless, permitted relitigating this latter issue because much of the same testimony was necessary to determine the insured's good health twenty-six days

---

12. Prior to trial Cleveland Stevedore raised this matter by filing a motion for collateral estoppel and a motion for summary judgment. Although the latter motion included photocopies of the trial and appellate opinions in the MDL 587 litigation, Cleveland Stevedore never filed certified copies of the relevant documents. At least one court has held that the failure to file such documents "reinforces the denial of the application" for preclusion. *Struzynski v. Borden Chem. Div., Borden Inc.* (1989), 57 Ohio App.3d 118, 120, 567 N.E.2d 279, 282.

earlier and, therefore, collateral estoppel would not result in judicial economy. The same circumstances are present in the case at bar because the antitrust issues adjudicated in MDL 587 did not concern the period from 1956 through 1968.

We note, moreover, that even if the issues were identical and the other threshold requirements were satisfied, declining to apply collateral estoppel did not result in reversible error for additional reasons: there was neither mutuality nor an abuse of discretion. Areeda, Antitrust Law, *supra*, at 130–139, Paragraph 336. It is undisputed that the requirements of mutuality are not satisfied, because Cleveland Stevedore was not a party in the MDL 587 litigation and was not in privity with any party to that litigation.

The parties generally recognize that Ohio law governing the mutuality requirement of collateral estoppel is somewhat more restrictive than under federal law. *Broz v. Winland* (1994), 68 Ohio St.3d 521, 523, 629 N.E.2d 395, 396–397, citing *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 2 OBR 732, 443 N.E.2d 978. Even if we applied the more permissive federal standards, as Cleveland Stevedore requests, we find no error or abuse of discretion by the trial court in declining to apply the doctrine in this case. See *Parklane Hosiery Co. v. Shore* (1979), 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552, adopting the abuse-of-discretion standard of review.

The Supreme Court of Ohio has held that, to constitute a reversible abuse of discretion, the trial court's ruling "must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias." *Nakoff v. Fairview Gen. Hosp.* (1996), 75 Ohio St.3d 254, 256, 662 N.E.2d 1, 3. The record in the case at bar does not satisfy this stringent standard. Even if one were inclined to apply collateral estoppel, moreover, this case presented considerable practical difficulty in determining where to draw the line concerning which issues were precluded.

To invoke collateral estoppel, Cleveland Stevedore asked the trial court to rely upon a judgment from the MDL 587 litigation. That judgment concerning the scope of the railroad-regulated industry defenses, however, was sufficiently inconsistent with a prior judgment for defendant in *Pinney Dock, supra.*[13] It is not clear which case the trial court should have followed on this point. The

---

**13.** MDL 587 held that the claims were not barred by Section 5a immunity under Section 10706, Title 49, U.S. Code or the *Keogh* doctrine. *In re Lower Lake Erie Iron Ore Antitrust Litigation* (C.A.3, 1993), 998 F.2d 1144. *Pinney Dock,* however, held that certain claims were barred by these principles. *Pinney Dock & Transp. Corp. v. Penn Cent. Corp.* (C.A.6, 1988), 838 F.2d 1445.

United States Supreme Court specifically recognized that such inconsistency provides a valid basis for declining to invoke offensive nonmutual collateral estoppel in *Parklane Hosiery Co. v. Shore, supra,* 439 U.S. at 330, 99 S.Ct. at 651, 58 L.Ed.2d at 561–562, its seminal case governing application of these principles.[14]

Moreover, the MDL 587 findings were mixed, depended upon the plaintiff, and did not resolve claims involving every dock under all circumstances. The jury in MDL 587 found (1) in favor of the city of Erie, Pennsylvania, concerning its dock claim; (2) in favor of the Wills plaintiffs in Toledo, Ohio, concerning one dock, but against it on another; and (3) against the Rainey plaintiffs on their claims. *In re Lower Lake Erie Iron Ore Antitrust Litigation, supra.* Because of differences in individual particular circumstances, application of collateral estoppel is exceedingly difficult. Moreover, there may be an inconsistency between claims in the case at bar and MDL 587. In the latter, recovery was based, in part, on claims by at least one steel company that it would have used its own docks. In the case at bar, Cleveland Stevedore claimed that this company would have used Cleveland Stevedore's facilities. Under the circumstances, the trial court could properly permit the parties an opportunity to litigate their claims. See *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 66–68, 567 N.E.2d 1291, 1298–1301.

Finally, regardless of the merits of the trial court's ruling declining to apply collateral estoppel, Cleveland Stevedore has failed to show any prejudice. See *Continental Ins. Co. v. Whittington* (1994), 71 Ohio St.3d 150, 642 N.E.2d 615. The trial court submitted all issues to the jury, which found in favor of Cleveland Stevedore on the existence of a conspiracy and Bessemer's knowing participation. Cleveland Stevedore did not request the trial court to submit additional interrogatories to the jury concerning the other elements for which it sought to invoke collateral estoppel. In fact, the jury did not make a finding on any of the remaining issues on which Cleveland Stevedore sought collateral estoppel.

Cleveland Stevedore recognized when filing its motions that, even if these matters had been deemed to be established, it was still required to prove causation of injury in fact and damages. In an answer to an interrogatory originally proposed by Cleveland Stevedore, the jury found that Bessemer's conduct was not "a material cause in fact to the business or property of" Cleveland Stevedore. Although the jury's finding of no causation may be due to

---

**14.** There is likewise evidence that Cleveland Stevedore could have joined in the prior MDL 587 litigation to warrant denying its request to invoke offensive nonmutual collateral estoppel in the case at bar. See *Eason v. Linden Avionics, Inc.* (D.N.J.1989), 706 F.Supp. 311, 318–319. After the Bessemer indictment, Cleveland Stevedore was contacted in 1982 and again in 1984, this time by an MDL 587 expert, six years before this case. Counsel for Cleveland Stevedore also represented parties in *Pinney Dock* and MDL 587.

any number of factors, it would be pure speculation to conclude that it was due to factual findings that conflicted with those the jury made concerning liability in MDL 587.

We also reject Cleveland Stevedore's contention that permitting the jury to consider all factual disputes in the case created "chaos and confusion about real issues at stake." In light of the jury's specific findings, there is no indication of any chaos or confusion. Under the circumstances, Cleveland Stevedore has failed to show that the trial court's decision to deny collateral estoppel adversely affected the jury's finding on injury in fact.

Accordingly, Cleveland Stevedore's second assignment of error is overruled.

## III

Cleveland Stevedore's third and final assignment of error follows:

"The lower court erred in admitting improper expert opinion testimony of Thomas Good."

This assignment lacks merit.

Cleveland Stevedore argues generally that Thomas Good was not competent to testify as an expert witness and that certain opinion testimony offered by him lacked an adequate foundation. It specifically challenges his familiarity with bank lending standards during the relevant time period and his testimony denying the plaintiff had any intent or preparedness to develop docks for iron ore self-unloading vessels.[15]

Good testified that he was a licensed certified public accountant and partner of Arthur Andersen, L.L.P. He received his B.A. and M.B.A. from Dartmouth College before he began working in 1965 for the accounting and management consulting firm. He testified that he specialized in private closely held corporations like Cleveland Stevedore and was audit partner for another shipping firm, Pickands Mather, from the 1970s through approximately 1986. Pickands Mather, along with three other companies, also owned Interlake Steamship, which operated ore docks.

Good's duties included assisting clients in bank negotiations, finding sources of financing, and dealing with "financial people." Since the 1970s, he had experience with the former Central National Bank, Cleveland Stevedore's bank, and

---

**15.** Good's written expert report contained similar statements. Redactions were subsequently made to the report. Cleveland Stevedore withdrew its objection to the report when it was redacted and did not include in the appellate record the redacted version. For these reasons Cleveland Stevedore may have waived any error concerning Good's testimony. We decline, however, to rule on this basis, because we prefer to address the merits.

other local banks. He served for seven years as a member, with several bankers, on the loan approval committee of the Cleveland Area Development Finance Corp., an organization responsible for recommending whether to make loans under the federal Small Business Administration loan program.

During *voir dire,* Good admitted that, prior to 1970, his experience with banks was limited, but he did not believe that lending standards had changed. He stated that banks review various financial ratios and data when they decide whether to make particular loans.[16] He explained that although he did not research specific lending criteria because banks did not publish them, as a result of his years of experience he had developed an understanding of the basis banks use to extend credit.

It is well established that rulings concerning the admissibility and scope of expert opinion testimony are within the broad discretion of the trial court and will not be reversed on appeal absent a clear showing of an abuse of discretion resulting in material adverse prejudice.

The Supreme Court of Ohio summarized the standard governing determinations of the qualification of expert witnesses to testify as follows:

"The rule governing the admission of expert testimony is former Evid.R. 702. This rule provided:

" 'If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, *a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion* or otherwise.' (Emphasis added.)

"While this rule permits expert testimony, a threshold determination must first be made under Evid.R. 104(A) concerning the qualifications of the witness to testify.

"To qualify as an expert, the witness need not be the best witness on the subject. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566. The expert must demonstrate some knowledge of the particular subject superior to that possessed by an ordinary juror. *State Auto Mut. Ins. Co. v. Chrysler Corp.* (1973), 36 Ohio St.2d 151, 160, 65 O.O.2d 374, 379, 304 N.E.2d 891, 897. A ruling concerning the admission of expert testimony is within the broad discretion of the trial court and will not be disturbed absent an abuse of discretion. *Alexander, supra,* 56 Ohio St.2d at 157,

---

**16.** During *voir dire* he testified that banks would not make a loan to a company if the company's net worth was less than fifty percent of the principal balance of the loan. During trial he testified that the first phase of Cleveland Stevedore's project would have required a bank to lend four times its net worth.

10 O.O.3d at 333, 383 N.E.2d at 565." *Scott v. Yates* (1994), 71 Ohio St.3d 219, 220–221, 643 N.E.2d 105, 106–107.

■ To constitute an abuse of discretion, the ruling must be more than legal error; it must be unreasonable, arbitrary, or unconscionable. *Nakoff v. Fairview Gen. Hosp.*, 75 Ohio St.3d at 256, 662 N.E.2d at 3–4; *Colboch v. Uniroyal Tire Co., Inc.* (1996), 108 Ohio App.3d 448, 461, 670 N.E.2d 1366, 1374–1375.

■ As a result of our review of the record in compliance with this standard, we find that the trial court did not abuse its discretion by finding Good qualified to testify as an expert. Certified public accountants frequently provide testimony concerning complex business damage claims. They are qualified to analyze the financial condition of a company and evaluate the damage model methods, assumptions, and estimates regarding lost business opportunities as in the case at bar. *E.g., Brookeside Ambulance v. Walker Ambulance Service* (1996), 112 Ohio App.3d 150, 678 N.E.2d 248. In this case, Good had extensive prior experience analyzing financial aspects of business plans as well as independent experience in both the shipping and banking industries, experience not derived solely from the litigation.

Cleveland Stevedore complains that Good was not a banker. It is well established, however, that an expert need not be the best witness. Moreover, it is not clear whether testimony would be available from a banker with experience going back more than forty years. Good clearly possessed some knowledge of the particular subject superior to that possessed by ordinary jurors. Without showing any greater knowledge, Cleveland Stevedore's expert, Dr. Beyer, testified that Cleveland Stevedore could have obtained the necessary loan. Moreover, the dispute concerning bank lending standards was not crucial to the outcome of this case because Cleveland Stevedore presented evidence that it could have obtained necessary funds from a venture capitalist.

■ Cleveland Stevedore's arguments concerning whether Good's opinions had a sufficient basis or whether the scope of his testimony should have been limited are governed by Evid.R. 703. It provides as follows:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

After reviewing the record, we conclude that there is sufficient evidence to support a finding that Good was familiar with the relevant lending standards based on his own personal knowledge or facts admitted into evidence at the hearing.

Proof of firsthand knowledge is often supplied by testimony of the witness. See, also, Evid.R. 602. In this case Good testified that he was familiar with commercial bank lending standards and did not believe that the standards had changed in the 1960s. His experience provided a rational basis for his opinions or inferences concerning the relevant lending standards. Significantly, Cleveland Stevedore did not present any evidence to support its claim that the lending standards had changed anytime after 1955. See, *e.g.*, *Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.* (C.A.4, 1980), 632 F.2d 1135, 1143 (the trial court improperly excluded expert opinion testimony from antitrust plaintiff concerning theater "splits" because defendant produced no evidence that splits differed by geographic location).

Good was an experienced financial professional who was familiar with business planning, was able to interpret the financial condition of companies, was qualified to assess the capital requirements for undertaking particular projects, and was familiar with capital availability for closely held businesses. He testified that Cleveland Stevedore did not even conduct a *pro forma* financial analysis for the projects and that such an analysis is customary if a company intended and was prepared to enter a new business. Contrary to Cleveland Stevedore's argument, his testimony concerning the inability to obtain debt financing was not a mere guess or baseless conjecture.

Any weakness in the factual underpinnings of his testimony went to the weight and or credibility of his testimony rather than its admissibility. *E.g., Johnson v. Knipp* (1973), 36 Ohio App.2d 218, 220, 65 O.O.2d 342, 343, 304 N.E.2d 914, 916:

"The absence of certain facts, or the failure of proof of others, goes to the weight and credibility of the testimony, and not to its admissibility. The burden falls on the opposing party to discredit or minimize the expert's testimony through cross-examination, just as defense counsel attempted to do in this case."

As noted in *Tolliver v. Consol. Rail Corp.* (1984), 11 Ohio St.3d 56, 58, 11 OBR 201, 203, 463 N.E.2d 389, 391, the trial court in the case at bar expressly cautioned the jury concerning expert witness testimony as follows:

"In determining the value of such opinion, you will consider the opportunity that such witnesses had to observe the facts and their knowledge of and experience on the subject. In addition, you will apply the usual rules for testing credibility and determining the weight to be given to testimony. You may accept or disregard such opinions. It is for you to determine what weight, if any, should be given to them.

"One who follows a special line of work may express his opinion because of his education, knowledge, and experience. Such testimony is admitted for whatever assistance it may provide to help you to arrive at a just verdict.

**504**

"Questions have been asked in which the expert witnesses were permitted to assume that certain facts were true and to give an opinion based on such assumption. You must determine whether the assumed facts on which the experts based their opinions are true. If any assumed fact was not established by the greater weight of the evidence, you will decide the effect of that failure on the value of the opinions of the experts. As with other witnesses, on you alone rests the duty of deciding what weight to give to the testimony of the experts. In deciding its weight, consider their skill, experience, knowledge, veracity, familiarity with the facts of the case, and the usual rules for testing credibility and deciding the weight to give the testimony."

Prior to concluding its instructions the trial court stated as follows:

"It is up to you to weigh the conflicting opinions of these experts, to carefully consider the reasons the experts gave in support of their opinions, and to assess the evidence that tends to support the opinions of plaintiff's experts or those of defendant's experts.

"As I have already instructed you, with each expert, you should consider the bases for his opinions, his knowledge or lack of knowledge of the record, and whether he took into account or failed to take into account factors that you find relevant to the determination of the amount of damages the plaintiff suffered.

"It is up to you to determine the weight, if any, you will give this testimony and evidence."

Under the circumstances, Cleveland Stevedore has failed to demonstrate the trial court erred or abused its discretion concerning the scope of Good's testimony.

Finally, even if the trial court committed any error concerning the admissibility or scope of expert opinion testimony, it would not be reversible absent a showing of prejudice. Evid.R. 103(A); Civ.R. 61. Cleveland Stevedore's claim of error relates to a few isolated comments selected from voluminous testimony. Under the circumstances, we are unable to conclude that the challenged testimony had any effect on the jury verdict or that the jury probably would have reached a different result without it. *E.g., Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St.2d 456, 474–475, 21 O.O.3d 285, 296–297, 424 N.E.2d 568, 581–582.

Accordingly, Cleveland Stevedore's third assignment of error is overruled.

*Judgment affirmed.*

NAHRA, P.J., and PATTON, J., concur.

APPENDIX

The trial court erred by (1) denying Bessemer's motion to exclude evidence of its immunized rate agreements; (2) denying Bessemer's directed verdict motion with respect to the conspiracy charges and Bessemer's related *Daubert* motion to strike Dr. Phillips "conspiracy" testimony; and (3) erroneously instructing the jury on antitrust immunity.