[Cite as *Miller v. Mission Essential Group, L.L.C.*, 2023-Ohio-3077.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Chris W. Miller et al., | : | |
| Plaintiffs-Appellees\ Cross-Appellants, | : | |
| | : | No. 22AP-448 |
| v. | | (C.P.C. No. 18CV-10362) |
| | : | |
| Mission Essential [Group], LLC, | | (REGULAR CALENDAR) |
| | : | |
| Defendant-Appellant\ Cross-Appellee. | : | |
| Chris W. Miller et al., | : | |
| Plaintiffs-Appellees\ Cross-Appellants, | : | No. 22AP-449 |
| | : | (C.P.C. No. 18CV-7997) |
| v. | : | |
| Gregory K. Miller, | : | (REGULAR CALENDAR) |
| Defendant-Appellee, | : | |
| Mission Essential [Group], LLC, | : | |
| Defendant-Appellant\ Cross-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on August 31, 2023

**On brief:** *Kooperman Mentel Ferguson Yaross, Katherine Connor Ferguson, Siqin Carol Wang*, and *Lindsay M. Nelson*; *Allen Stovall Neumann & Ashton LLP, Rick L. Ashton*, and *Jeffrey R. Corcoran*, for Chris W. Miller and The Scott A. Humphrys Trust Agreement. **Argued:** *Katherine Connor Ferguson.*

**On brief:** *Thompson Hine LLP*, *Anthony C.* White, and *Thomas Wyatt Palmer*, for *Mission Essential Group, LLC*. **Argued:** *Anthony C. White*.

APPEALS from the Franklin County Court of Common Pleas

LELAND, J.

{¶ 1} Defendant-appellant/cross-appellee, Mission Essential Personnel, LLC ("Mission Essential" or the "company"), appeals from a judgment of the Franklin County Court of Common Pleas granting plaintiffs-appellees/cross-appellants, Chris W. Miller and The Scott A. Humphrys Trust Agreement ("Humphrys") (collectively "plaintiffs"), the fair cash value of their respective membership interests in Mission Essential. Plaintiffs have filed a cross-appeal. For the reasons that follow, we affirm in part and reverse in part the judgment of the trial court.

## I. Facts and Procedural History

{¶ 2} Mission Essential was an Ohio limited liability company with its principal place of business in New Albany, Ohio. Mission Essential provided its clients with operational solutions to combat terrorism, transnational crime, natural disasters, and other hazards to global security. The company's clients included the United States Department of Defense, State and Homeland Security agencies, the intelligence community, and friendly foreign governments. The company was comprised of several different business segments, including a technology segment and a translation segment.

{¶ 3} In 2012, Mission Essential had the following four members: Greg Miller, who owned 42 percent interest in the company; Chad Monnin, who owned 42 percent interest in the company; Scott Humphrys, who owned 10 percent interest in the company; and Chris W. Miller (no relation to Greg Miller), who owned 6 percent interest in the company. The members executed the company's fourth operating agreement in 2012, which provided the company would be managed by a board of managers comprised of all four members. In 2015, Greg Miller purchased Monnin's entire membership interest. In early 2016, Greg Miller proposed that the remaining members execute the fifth operating agreement which, among other changes, would remove plaintiffs from the board of managers. Greg Miller signed the fifth operating agreement sometime after March 1, 2016; plaintiffs refused to sign the fifth operating agreement.

{¶ 4}    On September 21, 2018, in case No. 18CV-7997, plaintiffs filed a members' derivative action alleging that Greg Miller breached fiduciary duties he owed to Mission Essential, breached the fourth operating agreement, and breached fiduciary duties he owed to plaintiffs (the "fiduciary duty case"). Plaintiffs also demanded an accounting and sought a declaratory judgment finding the fifth operating agreement "invalid, unenforceable, and void." (Case No. 18CV-7997, Compl. at ¶ 80.)  On October 22, 2018, plaintiffs amended their complaint in the fiduciary duty case to add a claim for injunctive relief.

{¶ 5}    On October 23, 2018, Mission Essential held a meeting to vote on resolutions proposed by Greg Miller to restructure Mission Essential and merge it into a newly created domestic limited liability company. Greg Miller voted to adopt the resolutions at the meeting, while plaintiffs dissented. Greg Miller's 84 percent ownership interest was sufficient to pass the proposed resolutions.[1] On November 1, 2018, plaintiffs asserted their rights as dissenting members and demanded the fair cash value of their respective membership interests. Following the assertion of their dissenters' rights, plaintiffs amended their complaint in the fiduciary duty case by removing their derivative claim for breach of fiduciary duty, their claim for accounting, and their claim for injunctive relief and adding a claim for breach of the fifth operating agreement.  Greg Miller filed a counterclaim in the fiduciary duty case, asserting a claim for abuse of process.

{¶ 6}    On December 13, 2018, in case No. 18CV-10362, plaintiffs filed a complaint asking the court to determine the fair cash value of their respective membership interests in Mission Essential pursuant to R.C. 1705.42[2] (the "dissenters' rights case"). On December 28, 2018, plaintiffs filed a motion to consolidate the fiduciary duty case with the dissenters' rights case.

---

[1] Following the merger, Mission Essential Personnel, LLC merged out of existence and The Mission Essential Group, LLC came into existence. On October 1, 2021, the trial court granted plaintiffs' motion to substitute The Mission Essential Group, LLC for Mission Essential Personnel, LLC in the trial court. All references to "Mission Essential" or "the company" throughout this decision are either to The Mission Essential Group, LLC or Mission Essential Personnel, LLC, as appropriate.

[2] Effective January 1, 2022, the General Assembly repealed R.C. Chapter 1705 and enacted R.C. Chapter 1706, the Ohio Revised Limited Liability Company Act, pursuant to 2020 Am.Sub.S.B. No. 276. The Act provided that the repeal of R.C. Chapter 1705 would "not affect an action commenced, proceeding brought, or right accrued prior to January 1, 2022." S.B. 276 at Section 5. Accordingly, R.C. Chapter 1705 applies to the present case and all references to R.C. Chapter 1705 throughout this decision are to the version of that chapter in effect prior to January 1, 2022.

{¶ 7} On December 31, 2018, Mission Essential filed a combined Civ.R. 12(B)(6) motion to dismiss the complaint in the dissenters' rights case or, alternatively, a motion to stay the dissenters' rights case. Mission Essential asserted that plaintiffs failed to state a claim for relief under R.C. Chapter 1705, because they alleged in the complaint that the fourth operating agreement controlled the company and provided a reasonable method for determining the value of their membership interests. Alternatively, Mission Essential asked the court to stay the dissenters' rights case pending the outcome of the fiduciary duty case. Plaintiffs opposed Mission Essential's motion to dismiss and opposed the motion to stay. On February 26, 2019, the trial court consolidated the fiduciary duty case with the dissenters' rights case.

{¶ 8} On October 2, 2019, the trial court issued a decision and entry denying Mission Essential's Civ.R. 12(B)(6) motion to dismiss and granting Mission Essential's motion to stay the dissenters' rights case. The court observed that, pursuant to R.C. 1705.41(F), a company's operating agreement could prevent a dissenting member from seeking relief under R.C. 1705.42 if the operating agreement provided a reasonable basis for determining and paying the fair cash value of a dissenting member's interest. The court concluded that it had to determine "which Operating Agreement controls, and whether the controlling Operating Agreement provides a reasonable basis for determining the fair market value of a member's interest," before it could determine the fair cash value of plaintiffs' membership interests in the dissenters' rights case. (Oct. 2, 2019 Decision at 5.)

{¶ 9} Plaintiffs filed a motion for partial summary judgment on July 15, 2020, asserting that they were entitled to seek relief under R.C. 1705.42 because neither the fourth nor the fifth operating agreement provided a reasonable method for determining and paying the fair cash value of their membership interests. Plaintiffs acknowledged that both operating agreements provided Mission Essential with the ability to repurchase a member's interest in certain designated scenarios, but noted that the operating agreements did not address a dissenters' rights proceeding. Plaintiffs also argued the fifth operating agreement was invalid and unenforceable.

{¶ 10} On July 23, 2020, Mission Essential filed a memorandum contra plaintiffs' motion for partial summary judgement. Mission Essential asserted the fifth operating agreement was valid and enforceable, and that the repurchase provisions in either the

fourth or the fifth operating agreement provided a reasonable method for determining and paying the fair cash value of plaintiffs' membership interests. That same day, Mission Essential also filed a Civ.R. 56(F) motion asking the court to continue the hearing on plaintiffs' motion for partial summary judgment so that Mission Essential could depose plaintiffs.

{¶ 11} The trial court issued a decision and entry granting plaintiffs' motion for partial summary judgment and denying Mission Essential's motion for a Civ.R. 56(F) continuance on August 22, 2020. The court found a continuance for additional discovery unnecessary because the issue before the court was a legal issue. The court examined the language of the operating agreements and held that neither operating agreement contained "*any* basis for determining and paying the fair cash value of a dissenting member's interest * * *, let alone a '*reasonable* basis.' " (Emphasis sic.) (Aug. 22, 2020 Decision at 8.) As such, the court held that plaintiffs could seek relief as dissenting members under R.C. 1705.42. The court also found that the repurchase provisions of the operating agreements would be unreasonable if they were applied to a dissenters' rights proceeding.

{¶ 12} On November 20, 2020, the court issued an agreed order appointing Jason MacMorran to serve as the court-appointed appraiser in the dissenters' rights case. The November 20, 2020 order also directed the parties to submit briefs to the court addressing whether the term "fair cash value" in R.C. 1705.42(B) "include[d] the application of discounts for lack of marketability and/or minority status." (Nov. 20, 2020 Agreed Order at 3.) In their briefs addressing the discounts, plaintiffs argued that minority and marketability discounts were inappropriate in the present case, while Mission Essential argued that Ohio case law obligated the court to apply the discounts.

{¶ 13} On February 19, 2021, Mission Essential filed a motion asking the trial court to reconsider its decision and entry denying the Civ.R. 56(F) motion. Mission Essential argued the court should reconsider its prior ruling because, when the court granted plaintiffs' motion for partial summary judgment, no discovery had occurred in the dissenters' rights case due to the October 2, 2019 stay. The trial court denied Mission Essential's motion to reconsider.

{¶ 14} On May 7, 2021, MacMorran submitted his expert report regarding the fair cash value of plaintiffs' membership interests to the court. MacMorran explained in the

report that he used the R.C. 1705.42 definition of "fair cash value" as his standard of value and that he considered "only those facts and circumstances that were known or knowable as of the valuation date" of October 22, 2018. (MacMorran Report at 2-3.) MacMorran identified the information he relied on to conduct his analysis, which included the company's audited financial statements for the years 2013 to 2017, federal forms 1065 for the years 2013 to 2017, budgets for the years ending December 31, 2018 and December 31, 2019, depreciation reports, and interviews he conducted with plaintiffs and with Mission Essential's Vice Chairman Jon Ricker. MacMorran also developed prospective financial information for the company relying on historical trends, industry observations, and the company's "2019 budget as a base." (MacMorran Report at 9.)

{¶ 15} MacMorran explained in his report that Mission Essential originally provided him with one budget for 2019 (the "original 2019 budget"), and then subsequently provided him with a different budget for 2019 (the "alternative 2019 budget"). MacMorran explained that the alternative 2019 budget "lacked detail" and reflected a "materially lower" Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") margin than the company's "historical data, the originally provided 2019 budget, and industry data (from guideline public companies)." (MacMorran Report at 10.) MacMorran explained that he asked the company to provide "detailed support for this alternative budget or corporate documentation ratifying the budget," but that "no such information [was] provided." (MacMorran Report at 11, fn. 7.) As such, MacMorran found the original 2019 budget to be reliable and did not consider the alternative 2019 budget in his valuation analysis.

{¶ 16} To conduct his analysis MacMorran considered various valuation methods, including the net asset value method, the discounted cash flow method, and the guideline publicly traded company method. MacMorran also explained that "[a]t the Court's request," he valued plaintiffs' membership interests both "with and without adjustment for lack of control and lack of marketability, such that a subsequent legal determination on this issue does not require additional valuation procedures." (MacMorran Report at 3.) MacMorran found the fair cash value of Humphrys' 10 percent interest in Mission Essential to be $8,550,000 without minority or marketability discounts and $6,520,000 with minority and marketability discounts. MacMorran found the fair cash value of Chris

Miller's 6 percent interest in Mission Essential to be $5,130,000 without minority or marketability discounts and $3,910,000 with minority and marketability discounts.

{¶ 17} The parties submitted objections to MacMorran's report on September 13, 2021. Plaintiffs largely agreed with MacMorran's analysis and objected only to MacMorran's decision not to consider the guideline transaction method of valuation. Mission Essential claimed that MacMorran's opinion of value was "substantially inflated" because he relied on the original 2019 budget rather than the alternative 2019 budget. (Mission Essential Obj. at 1.) Mission Essential asserted that if MacMorran had relied on the alternative 2019 budget, he would have found Humphrys' interest to be $2,810,000 with minority and marketability discounts and Chris Miller's interest to be $1,686,000 with minority and marketability discounts. Mission Essential supported its objection with a valuation report prepared by KPMG, LLC and an affidavit from Ricker.

{¶ 18} On February 15, 2022, the trial court held a hearing to determine the fair cash value of plaintiffs' membership interests. MacMorran was the only witness to testify at the hearing. MacMorran provided extensive testimony at the hearing addressing why he found the original 2019 budget to be more reliable than the alternative 2019 budget.

{¶ 19} On June 23, 2022, the trial court issued a decision and entry determining the fair cash value of plaintiffs' membership interests. The court noted that, although Mission Essential argued "at length" that MacMorran erred by relying on the original rather than the alternate 2019 budget, MacMorran "provided a reasonable basis for excluding the Alternative Budget." (June 23, 2022 Decision at 8, 10.) The court also found that MacMorran "applied appropriate industry standard valuation methods and was credible when rendering his opinion." (June 23, 2020 Decision at 10.) The court found discounts for the minority status and lack of marketability of plaintiffs' membership interests to be appropriate in the case. The court relied on MacMorran's opinions of value and found the fair cash value of Chris Miller's interest to be $3,910,000 and the fair cash value of Humphrys' interest to be $6,520,000. The court entered judgment against Mission Essential with interest at the rate of 6 percent per annum from November 1, 2018 and included Civ.R. 54(B) language in the entry. On June 24, 2022, the court issued a nunc pro tunc entry correcting a clerical error in the June 23, 2022 decision and entry.

## II. Assignments of Error

{¶ 20} Mission Essential appeals and assigns the following eight assignments of error for our review:

> [I.] The Trial Court erred by denying Mission Essential's Motion to Dismiss Complaint.
>
> [II.] The Trial Court abused its discretion by denying Mission Essential's Civil Rule 56(F) Motion to Continue Hearing on Appellees['] Motion for Partial Summary Judgment.
>
> [III.] The Trial Court abused its discretion by denying Mission Essential's Motion to Reconsider the Rule 56(F) Motion.
>
> [IV.] The Trial Court erred by entering judgment in a stayed case.
>
> [V.] The Trial Court erred by granting Appellees' Motion for Partial Summary Judgment.
>
> [VI.] The Trial Court abused its discretion by admitting Mr. MacMorran's opinion of fair cash value and by denying Mission Essential's objections to Mr. MacMorran's Report.
>
> [VII.] The Trial Court abused its discretion by awarding interest at the rate of 6 percent.
>
> [VIII.] The June 23, 2022 Decision and Judgment is against the manifest weight of the evidence.

{¶ 21} Plaintiffs cross-appeal and assign the following two cross-assignments of error for our review:

> [I.] The trial court erred as a matter of law when it applied discounts for lack of marketability and minority status to determine the fair cash value of Plaintiffs-Cross Appellants' ("Appellees") membership interests in Mission Essential Personnel, LLC ("Mission Essential") where the General Assembly made clear that discounts are not to be applied to fair cash value determinations in dissenters' rights proceedings.
>
> [II.] The trial court abused its discretion in applying discounts for lack of marketability and minority status to determine the fair cash value of Appellees' membership interests in Mission Essential where the application of such discounts serves only to punish Appellees and create a windfall to Mission Essential.

### III.  First Assignment of Error – Motion to Dismiss

{¶ 22} Mission Essential's first assignment of error asserts the trial court erred by denying its Civ.R. 12(B)(6) motion to dismiss the complaint in the dissenters' rights case.

{¶ 23} A Civ.R. 12(B)(6) motion to dismiss for failure to state a claim is procedural and tests the sufficiency of the complaint. *Morrow v. Reminger & Reminger Co., L.P.A.*, 183 Ohio App.3d 40, 2009-Ohio-2665, ¶ 7, (10th Dist.).  A court may dismiss a complaint for failure to state a claim only if it appears beyond doubt from the complaint that the plaintiff can prove no set of facts entitling the plaintiff to recovery.  *O'Brien v. Univ. Community Tenants Union, Inc.*, 42 Ohio St.2d 242 (1975), syllabus.  In reviewing a Civ.R. 12(B)(6) motion to dismiss, the court must presume all factual allegations contained in the complaint to be true and must make all reasonable inferences in favor of the plaintiff. *Bullard v. McDonald's*, 10th Dist. No. 20AP-374, 2021-Ohio-1505, ¶ 11, citing *Jones v. Greyhound Lines, Inc.*, 10th Dist. No. 11AP-518, 2012-Ohio-4409, ¶ 31.  "An appellate court reviews a trial court's dismissal pursuant to Civ.R. 12(B)(6) de novo." *Dunlop v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 16AP-550, 2017-Ohio-5531, ¶ 10.

{¶ 24} Mission Essential contends that plaintiffs' allegations in the complaint demonstrated that R.C. 1705.41(F) precluded them from seeking relief under R.C. 1705.42. R.C. 1705.41 provides that, if a limited liability company ("LLC") member votes against a proposed merger, consolidation, or conversion, "[n]ot later than ten days after the date on which the vote on the proposal was taken at the meeting of the members, the dissenting member shall deliver to the company a written demand for payment to the dissenting member of the fair cash value of the membership interests as to which the dissenting member seeks relief." R.C. 1705.41(B).  R.C. 1705.41(F) provides:

> Unless the operating agreement of the domestic limited liability company in which the dissenting member was a member provides a reasonable basis for determining and paying the fair cash value of the membership interests as to which the dissenting member seeks relief or unless that company and the dissenting member have come to an agreement on the fair cash value of those interests, within three months after the service of the demand for payment of the fair cash value of those interests, the dissenting member, that company, or the surviving or new entity may file a complaint under section 1705.42 of the Revised Code.

{¶ 25} When a dissenting member files a complaint under R.C. 1705.42, the court must "fix[] a date for a hearing on the complaint." R.C. 1705.42(A)(2). Following the hearing, the court must "make findings as to the fair cash value of the membership interests and render judgment against the limited liability company for the payment of that fair cash value." R.C. 1705.42(A)(2). The court must determine the fair cash value of the member's interest "as of the day before the day" on which the vote on the proposal was taken. R.C. 1705.42(B).

{¶ 26} Plaintiffs alleged in their complaint in the dissenters' rights case that the parties "disagree[d] on whether the Fourth [Operating Agreement] or the Fifth [Operating Agreement] applies to determine fair cash value of Plaintiffs' membership interests." (Case No. 18CV-10362 Compl. at ¶ 44.) Plaintiffs also alleged that the fourth operating agreement controlled the company. Mission Essential asserts that, accepting plaintiffs' allegations as true, the fourth operating agreement provided a reasonable basis for determining the fair cash value of their membership interests. As such, Mission Essential asserts that plaintiffs failed to state a claim for relief as dissenting members under R.C. Chapter 1705.

{¶ 27} However, the statements that Mission Essential relies on to support dismissal all concern the language of the operating agreements. "The interpretation and construction of written contracts is a question of law subject to de novo review on appeal." *Hastings Mut. Ins. Co. v. Village Communities Real Estate, Inc.*, 10th Dist. No. 14AP-35, 2014-Ohio-2916, ¶ 13, citing *State v. Fed. Ins. Co.*, 10th Dist. No. 04AP-1350, 2005-Ohio-6807, ¶ 22. *Accord Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus; *491 N. Park Real Estate, L.L.C. v. Spice Partners, L.L.C.*, 10th Dist. No. 14AP-304, 2014-Ohio-5164, ¶ 10. The principal goal in construing contract language is to effectuate the intent of the parties, which we presume resides in the language they chose to employ in the agreement. *In re All Kelley & Ferraro Asbestos Cases*, 104 Ohio St.3d 605, 2004-Ohio-7104, ¶ 29; *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus.

{¶ 28} Thus, plaintiffs' statements concerning the language of the operating agreements amounted to legal, rather than factual, conclusions. A court need not accept as true "conclusory legal propositions advanced in the complaint." *Bullard* at ¶ 11, citing *Morrow* at ¶ 7. *Accord State ex rel. Duncan v. Am. Transm. Sys.*, 166 Ohio St.3d 416,

2022-Ohio-323, ¶ 10, citing *State ex rel. Martre v. Reed*, 161 Ohio St.3d 281, 2020-Ohio-4777, ¶ 2. *Compare Williams-Diggins v. Permanent Gen. Assur. Corp.*, 8th Dist. No. 108846, 2020-Ohio-3973, ¶ 39 (finding that, because "[n]o determination of fact [could] alter the unambiguous [contract language]," the trial court "properly dismissed [plaintiff's] complaint for failure to state a claim").

**{¶ 29}** Plaintiffs also attached the fourth and the fifth operating agreements to their complaint in the dissenters' rights case. While a trial court may not rely on evidence or allegations from outside the complaint to determine a Civ.R. 12(B)(6) motion, "[a] copy of any written instrument attached to a pleading is a part of the pleading for all purposes." Civ.R. 10(C). *Accord State ex rel. Fuqua v. Alexander*, 79 Ohio St.3d 206, 207 (1997); *Manifold & Phalor, Inc.*, 10th Dist. No. 19AP-737, 2020-Ohio-7009, ¶ 10. Accordingly, the trial court could have reviewed the language of the operating agreements to assess whether the operating agreements' provisions contradicted plaintiffs' allegations in the complaint. *See State ex rel. Washington v. D'Apolito*, 156 Ohio St.3d 77, 2018-Ohio-5135, ¶ 10 (stating that a court need not "accept allegations in a complaint as true when they are contradicted by documents attached to the complaint").

**{¶ 30}** Mission Essential fails to demonstrate that plaintiffs failed to state a claim for relief as dissenting members under R.C. Chapter 1705. As such, Mission Essential's first assignment of error is overruled.

## IV.  Second & Third Assignments of Error – Civ.R. 56(F) Motion

**{¶ 31}** Mission Essential's second assignment of error asserts the trial court abused its discretion by denying Mission Essential's Civ.R. 56(F) motion. Mission Essential's third assignment of error asserts the trial court erred by denying the company's motion to reconsider the court's ruling on the Civ.R. 56(F) motion. As the second and third assignments of error both concern the Civ.R. 56(F) motion, we address them jointly.

**{¶ 32}** The trial court explained that the issue in plaintiffs' motion for partial summary judgment, regarding whether the fourth or fifth operating agreement "provide[d] a reasonable basis for determining and paying the fair cash value of Plaintiffs' membership interests within the meaning of R.C. 1705.41(F)," was a "legal issue." (Aug. 22, 2020 Decision at 3.) As such, the court denied Mission Essential's Civ.R. 56(F) motion because

"no further discovery [would] change the Court's determination" on the legal issue. (Aug. 22, 2020 Decision at 3.)

{¶ 33} Civ.R. 56(F) provides as follows:

When affidavits unavailable.

Should it appear from the affidavits of a party opposing the motion for summary judgment that the party cannot for sufficient reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just.

{¶ 34} The provisions of Civ.R. 56(F) are discretionary, not mandatory. *ABN AMRO Mtge. Group, Inc. v. Roush*, 10th Dist. No. 04AP-457, 2005-Ohio-1763, ¶ 23. Accordingly, we will not reverse a trial court's denial of a Civ.R. 56(F) motion absent an abuse of discretion. *Id*. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). *See also Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985).

{¶ 35} Civ.R. 56(F) "requires the party seeking a continuance to submit an affidavit stating sufficient reasons why the party cannot present facts essential to justify the party's opposition to the summary judgment motion." *Perpetual Fed. Savs. Bank v. TDS2 Property Mgt., L.L.C.*, 10th Dist. No. 09AP-285, 2009-Ohio-6774, ¶ 13, citing *Roush* at ¶ 22. "Simply requesting a continuance in order to conduct discovery is not a sufficient explanation for why a party cannot present affidavits in opposition to the motion for summary judgment." *Id*. *See Marshall v. Silsby*, 11th Dist. No. 2004-L-094, 2005-Ohio-5609, ¶ 18. "[A] party's own lack of diligence undermines his or her claim that sufficient reasons exist for a Civ.R. 56(F) continuance." *Whiteside v. Conroy*, 10th Dist. No. 05AP-123, 2005-Ohio-5098, ¶ 39.

{¶ 36} In the Civ.R. 56(F) motion, Mission Essential asserted that a continuance was necessary because discovery was "stayed" in the case pursuant to H.B. No. 197, the COVID-19 emergency relief statute, and because plaintiffs allegedly refused to appear for their depositions. (July 23, 2020 Mot. to Continue at 2.) Mission Essential first raised the October 2, 2019 stay as a basis for the continuance in its August 6, 2020 reply to plaintiffs' memorandum contra the Civ.R. 56(F) motion. *See Holmes v. Sullinger*, 6th Dist. No. L-18-

1106, 2019-Ohio-2653, ¶ 20, quoting *Internatl. Fid. Ins. Co. v. TC Architects*, 9th Dist. No. 23112, 2006-Ohio-4869, ¶ 11; *Smith v. Ray Esser & Sons, Inc.*, 9th Dist. No. 10CA009798, 2011-Ohio-1529, ¶ 15 (explaining that in the summary judgment context "[a]llowing a new argument to be asserted in a reply brief has been characterized as 'summary judgment by ambush,' " and that a trial court should either " 'strike the reply * * * or, alternatively, * * * allow the opposing party to file a surreply' "; *Lance Acceptance Corp. v. Claudio*, 9th Dist. No. 02CA008201, 2003-Ohio-3503, ¶ 18.

{¶ 37} Regardless, the trial court did not abuse its discretion by denying the Civ.R. 56(F) motion. The trial court granted plaintiffs' motion for summary judgment based on its conclusion that neither the fourth nor fifth operating agreement contained any basis for determining and paying the fair cash value of a dissenting member's interest. Because the court's interpretation of the operating agreements was a matter of law, no discovery was necessary to resolve this legal issue. *See State ex rel. Sawyer v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 110 Ohio St.3d 343, 2006-Ohio-4574, ¶ 10 (holding that, because the "motion for summary judgment raised purely legal arguments," and "[a]dditional discovery was unnecessary to resolve those legal issues," the trial court did not abuse its discretion by denying a Civ.R. 56(F) motion); *Bank of Am., N.A. v. Omega Design/Build Group, L.L.C.*, 1st Dist. No. C-100018, 2011-Ohio-1650, syllabus (stating that the trial court did not abuse its discretion by denying the Civ.R. 56(F) motion since "discovery was unnecessary for resolution of the discrete legal issue of lien priority"); *Jefferson Golf & Country Club v. Leonard*, 10th Dist. No. 11AP-434, 2011-Ohio-6829; *Brown v. Miller*, 11th Dist. No. 2012-G-3055, 2012-Ohio-5223, ¶ 25; *Dottore v. Vorys, Sater, Seymour & Pease, L.L.P.*, 8th Dist. No. 98861, 2014-Ohio-25, ¶ 90.

{¶ 38} Mission Essential contends it was entitled to conduct discovery in the dissenters' rights case regarding the reasonableness of the operating agreements valuation and payment provisions. Although the trial court analyzed whether the repurchase provisions of the operating agreements were reasonable, the court's reasonableness analysis was unnecessary. Once the trial court determined that the operating agreements did not contain any basis for determining and paying the fair cash value of a dissenting member's interest, there was no need to address whether other, inapplicable provisions in the operating agreements were reasonable. As such, any error in the court's analysis of the

reasonableness of the repurchase provisions would amount to harmless error. *See* Civ.R. 61 (stating that a court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties"); *Wallick Properties Midwest, L.L.C. v. Jama*, 10th Dist. No. 20AP-299, 2021-Ohio-2830, ¶ 20; *O'Brien v. Angley*, 63 Ohio St.2d 159, 164 (1980). *See also State ex rel. McGrath v. Ohio Adult Parole Auth.*, 100 Ohio St.3d 72, 2003-Ohio-5062, ¶ 8 (holding that "[r]eviewing courts are not authorized to reverse a correct judgment on the basis that some or all of the lower court's reasons are erroneous"); *Grenga v. Youngstown State Univ.*, 10th Dist. No. 11AP-165, 2011-Ohio-5621, ¶ 26.

{¶ 39} Mission Essential asked the trial court to reconsider its ruling on the Civ.R. 56(F) motion because no discovery had occurred in the dissenters' rights case when the court granted plaintiffs' motion for partial summary judgment. " 'A trial court has plenary power in ruling on a motion for reconsideration, and [an appellate court] will not reverse such rulings absent an abuse of discretion.' " *Black v. Columbus Sports Network, L.L.C.*, 10th Dist. No. 13AP-1025, 2014-Ohio-3607, ¶ 19, quoting *Mindlin v. Zell*, 10th Dist. No. 11AP-983, 2012-Ohio-3543, ¶ 23. *Accord Tatsing v. Njume-Tatsing*, 10th Dist. No. 16AP-827, 2017-Ohio-8460, ¶ 9. As noted, because the trial court resolved plaintiffs' motion for partial summary judgement based on a legal issue, no discovery would have impacted the court's ruling. As such, the trial court did not abuse its discretion by denying Mission Essential's motion for reconsideration.

{¶ 40} Based on the foregoing, Mission Essential's second and third assignments of error are overruled.

## V. Fourth Assignment of Error – Stay

{¶ 41} Mission Essential's fourth assignment of error asserts the trial court erred by granting plaintiffs' motion for partial summary judgment while the stay in the dissenters' rights case was effective. Mission Essential contends the court's August 22, 2020 decision was "void ab initio" due to this alleged error. (Appellants' Brief at 40.) However, because the trial court possessed jurisdiction over the parties and the subject matter, any error in the exercise of the court's jurisdiction would render the judgment voidable, not void. *See Miller v. Nelson-Miller*, 132 Ohio St.3d 381, 2012-Ohio-2845, ¶ 1; *State v. Harper*, 160 Ohio St.3d 480, 2020-Ohio-2913, ¶ 4; *State v. Henderson*, 161 Ohio St.3d 285, 2020-Ohio-4784, ¶ 1.

{¶ 42} A stay is the postponement or halting of a proceeding. *Black's Law Dictionary* 1639 (10th Ed.2014). The power to grant or deny a stay is "[i]nherent within a court's jurisdiction, and essential to the orderly and efficient administration of justice." *State v. Hochhausler*, 76 Ohio St.3d 455, 464 (1996). *Accord Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (stating "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants"). "The determination of whether to issue a stay of proceedings generally rests within the court's discretion and will not be disturbed absent a showing of an abuse of discretion." *State ex rel. Verhovec v. Mascio*, 81 Ohio St.3d 334, 336 (1998), citing *State ex rel. Wallace v. Tyack*, 13 Ohio St.3d 4, 5-6 (1984).

{¶ 43} In the October 2, 2019 entry the court stated that, before it could determine the fair cash value of plaintiffs' membership interests in the dissenters' rights case, it had to "determine which Operating Agreement controls, and whether the controlling Operating Agreement provides a reasonable basis for determining the fair [cash] value of a member's interest." (Oct. 2, 2019 Decision at 5.) The court indicated that both "questions [had to] be determined in the [fiduciary duty case]." (Oct. 2, 2019 Decision at 5.) The court stayed the dissenters' rights case "and all discovery related" to the dissenters' rights case, "pending the determinations to [be] made in the [fiduciary duty case]." (Oct. 2, 2019 Decision at 6.)

{¶ 44} The court's statements in the October 2, 2019 entry demonstrate confusion regarding which claims were pending in each case before the court. When the court issued the stay the claims pending in the fiduciary duty case included plaintiffs' claims for breach of the operating agreements, breach of fiduciary duties, and for a declaratory judgment finding the fifth operating agreement invalid and unenforceable. The claims pending in the dissenters' rights case included only plaintiffs' claims for the fair cash value of their membership interests pursuant to R.C. Chapter 1705. Thus, while the issue regarding which operating agreement controlled the company pertained to plaintiffs' declaratory judgment claim in the fiduciary duty case, the issue regarding whether either operating agreement contained a reasonable basis for determining the fair cash value of a member's interest pertained only to the R.C. 1705.41(F) issue in the dissenters' rights case.

{¶ 45} Thus, while the October 2, 2019 entry stayed the dissenters' rights case, the entry demonstrated that the court would render a judgment on the potentially dispositive R.C. 1705.41(F) issue during the stay. "Courts have the power to stay proceedings pending resolution of potentially dispositive developments." *Guerriero v. Dept. of Rehab. & Corr.*, 11th Dist. No. 2001-A-0062, 2002-Ohio-5149, ¶ 16, citing *Hochhausler* at 464. *See also Pfaff v. Lynch*, 10th Dist. No. 77AP-870 (Apr. 6, 1978). Indeed, "[a] trial court acts within its discretion when it grants a stay of discovery pending the resolution of a dispositive motion." *Thomson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 09AP-782, 2010-Ohio-416, ¶ 32. The trial court therefore acted within its discretion to stay the dissenters' rights case pending resolution of the R.C. 1705.41(F) issue, which would determine whether plaintiffs were entitled to seek relief under R.C. Chapter 1705.

{¶ 46} Furthermore, even if we were to construe the October 2, 2019 entry as staying the dissenters' rights case in its entirety, the August 22, 2020 decision granting plaintiffs' motion for partial summary judgment implicitly lifted the stay. *See Rollins v. S. Mtge. Co.*, 427 S.E.2d 581 (Ga.App.1993) (holding that, although the court tried the case and entered judgment without formally lifting a previously issued stay, the court had plenary power to revoke its prior rulings and the court's action of trying the case "was sufficient indication that the stay in the * * * proceeding was lifted"); *Sultaana v. Jerman*, N.D. Ohio No. 1:15-CV-00382 (Aug. 29, 2019), fn. 2 (stating that "[a]s implied by the Court's order setting a trial date * * * th[e] case [was] no longer stayed"); *New Orleans Regional Physician Hosp. Org., Inc. v. United States*, 122 Fed.Cl. 807, 817 (2015), fn. 6. *See also Lear Corp. v. TS Tech USA Corp.*, S.D.Ohio No. 2:11-cv-245 (Mar. 12, 2013) (stating that "[w]here a court has already granted a stay, the court also has the inherent power and discretion to lift that stay when appropriate"); *Cty. School Bd. of York Cty. v. A.L.*, E.D. Va. No. 4:03CV174 (Mar. 6, 2007) (holding that "the lifting of a stay is governed by the terms of the order granting the stay"). On September 10, 2020, the trial court issued an order clarifying that the October 2, 2019 stay in the dissenters' rights case was "lifted as of August 22, 2020." (Sept. 10, 2020 Order at 1.)

{¶ 47} Mission Essential also fails to demonstrate how it was prejudiced by the October 2, 2019 stay. As noted, the terms of the October 2, 2019 order informed Mission Essential that the court would rule on the R.C. 1705.41(F) issue during the stay.

Additionally, on July 7, 2020, the court asked the parties to address "whether either [operating agreement contained] a reasonable basis for determining and distributing the fair cash value of Plaintiffs' shares." (Mot. For Recon., Ex. 1.) Mission Essential addressed the R.C. 1705.41(F) issue in its memorandum contra plaintiffs' motion for partial summary judgment. Accordingly, Mission Essential was unquestionably aware that the court would rule on the R.C. 1705.41(F) issue during the stay.

{¶ 48} Mission Essential contends the October 2, 2019 stay "denied [it the] full opportunity to be heard on the issue whether the Operating Agreements' valuation and payment provisions [were] reasonable." (Appellants' Brief at 41.) However, the trial court granted plaintiffs' motion for summary judgment based on its conclusion that, as a matter of law, the operating agreements did not contain "*any* basis for determining and paying the fair cash value of a dissenting member's interest." (Emphasis sic.) (Aug. 22, 2020 Decision at 8.) No amount of discovery on the reasonableness of the operating agreements' provisions would have impacted the court's decision. Accordingly, Mission Essential fails to establish any harm resulting from the October 2, 2019 stay. *See Wiles v. Miller*, 10th Dist. No. 12AP-989, 2013-Ohio-3625, ¶ 45 (holding that "to the extent the magistrate may have erred by ordering a stay of discovery[,] * * * any error was ultimately harmless because the trial court denied appellant's claims against the [appellees] as a matter of law"); Civ.R. 61; *Wallick Properties* at ¶ 20.

{¶ 49} Based on the foregoing, Mission Essential's fourth assignment of error is overruled.

## VI. Fifth Assignment of Error – Motion for Partial Summary Judgment

{¶ 50} Mission Essential's fifth assignment of error asserts the trial court erred by granting plaintiffs' motion for partial summary judgment. An appellate court reviews a grant of summary judgment under a de novo standard. *Capella III, L.L.C. v. Wilcox*, 190 Ohio App.3d 133, 2010-Ohio-4746, ¶ 16 (10th Dist.), citing *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001). "[D]e novo appellate review means that the court of appeals independently reviews the record and affords no deference to the trial court's decision." (Internal quotations and citations omitted.) *Holt v. State*, 10th Dist. No. 10AP-214, 2010-Ohio-6529, ¶ 9. Summary judgment is appropriate only when the moving party demonstrates: (1) no genuine issue of material fact exists, (2) the moving party is entitled

to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997). In ruling on a motion for summary judgment, the court must resolve all doubts and construe the evidence in favor of the non-moving party. *Premiere Radio Networks, Inc. v. Sandblast, L.P.*, 10th Dist. No. 18AP-736, 2019-Ohio-4015, ¶ 6, citing *Pilz v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 04AP-240, 2004-Ohio-4040, ¶ 8.

{¶ 51} Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and of identifying those portions of the record demonstrating the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the moving party fails to satisfy its initial burden, the court must deny the motion for summary judgment. *Id.* If the moving party satisfies its initial burden, summary judgment is appropriate unless the non-moving party responds, by affidavit or otherwise as provided under Civ.R. 56, with specific facts demonstrating a genuine issue exists for trial. *Id.*; *Hall v. Ohio State Univ. College of Humanities*, 10th Dist. No. 11AP-1068, 2012-Ohio-5036, ¶ 12, citing *Henkle v. Henkle*, 75 Ohio App.3d 732, 735 (12th Dist.1991).

{¶ 52} In its August 22, 2020 decision the trial court held that, pursuant to R.C. 1705.41(F), an operating agreement could prevent a dissenting member from seeking relief under R.C. 1705.42 if the operating agreement: (1) applied in a dissenter's rights proceeding, (2) provided that the dissenting member would receive fair cash value for the member's interests, and (3) provided a reasonable method for calculating and paying fair cash value for the member's interests. The court examined the language of the fourth and fifth operating agreements and found that "neither Operating Agreement reference[d] dissenter's rights proceedings or R.C. 1705.40 et. seq. in any way." (Aug. 22, 2020 Decision at 7-8.) Therefore, because neither operating agreement contained "*any* basis for determining and paying the fair cash value of a dissenting member's interest," the court held that plaintiffs could seek relief under R.C. 1705.42. (Emphasis sic.) (Aug. 22, 2020 Decision at 8.)

{¶ 53} Indeed, the fourth and fifth operating agreements do not address dissenters' rights in any way. The repurchase provisions of the fourth operating agreement provided

that, upon a member's death, disability, bankruptcy, or divorce, the company would "have the option to purchase all or a portion of" the member's interest at "fair market value." (Fourth Operating Agreement Section 9.7(a), 9.8(a), 9.9(a).) Fair market value of the member's interest would be determined by a single appraiser selected by mutual agreement of the parties or by averaging the fair market value determination from three appraisers. (Fourth Operating Agreement Section 9.14.) The repurchase provisions of the fifth operating agreement provided that, upon a minority member's death, disability, bankruptcy, divorce, termination from their employment with the company, or upon the manager's determination that the member no longer qualified as a member, the company would "have the right to repurchase all or a portion of the Units owned by a Minority Member." (Fifth Operating Agreement Section 9.6(a), (b).) The purchase price would be the "fair market value" of the interest, as determined by a single appraiser selected by Greg Miller. (Fifth Operating Agreement Section 9.6(c), 9.11.)

{¶ 54} Mission Essential contends the trial court erred in its interpretation of R.C. 1705.41(F), because the statute does not require "that an operating agreement must refer to dissenters rights, 'fair cash value,' [R.C.] Chapter 1705, or contain any other specific, magic words." (Appellants' Brief at 44.) Statutory interpretation is a question of law subject to de novo review. *Knollman-Wade Holdings*, *L.L.C. v. Platinum Ridge Properties*, *L.L.C.*, 10th Dist. No. 14AP-595, 2015-Ohio-1619, ¶ 13, citing *State v. Banks*, 10th Dist. No. 11AP-69, 2011-Ohio-4252, ¶ 13. The primary goal of statutory interpretation is to ascertain and give effect to the General Assembly's intent in enacting the statute. *Brooks Capital Servs.*, *L.L.C. v. 5151 Trabue Ltd.*, 10th Dist. No. 12AP-30, 2012-Ohio-4539, ¶ 16, citing *Yonkings v. Wilkinson*, 86 Ohio St.3d 225, 227 (1999). In determining legislative intent, we first look to the plain language of the statute. *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, ¶ 11, citing *State ex rel. Burrows v. Indus. Comm.*, 78 Ohio St.3d 78, 81 (1997). A court must consider statutory language in context, construing words and phrases according to the rules of grammar and common usage. *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, ¶ 16, citing *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, ¶ 34.

{¶ 55} A court must "evaluate a statute 'as a whole and giv[e] such interpretation as will give effect to every word and clause in it.' " *Boley v. Goodyear Tire & Rubber Co.*, 125

Ohio St.3d 510, 2010-Ohio-2550, ¶ 21, quoting *State ex rel. Myers v. Bd. of Edn.*, 95 Ohio St. 367, 373 (1917). *See* R.C. 1.47(B). Thus, a court must "give effect to the words the General Assembly has chosen, and * * * neither add to nor delete from the statutory language." *Gabbard v. Madison Local School Dist. Bd. of Edn.*, 165 Ohio St.3d 390, 2021-Ohio-2067, ¶ 13.

{¶ 56} Mission Essential asserts R.C. 1705.41(F) requires only that an operating agreement " 'provide[] a reasonable basis for determining and paying fair cash value,' and nothing more." (Appellants' Brief at 44, quoting R.C. 1705.41(F).) However, Mission Essential fails to give effect to every word in the statute. R.C. 1705.41(F) provides that, to displace R.C. 1705.42, an operating agreement must provide "a reasonable basis for determining and paying the fair cash value of the membership interests *as to which the dissenting member seeks relief.*" (Emphasis added.) R.C. 1705.41(F). Thus, under R.C. 1705.41(F) an operating agreement must provide a basis for determining the fair cash value of a dissenting member's interest, and not simply a member's interest generally. While an operating agreement need not recite any "magic words" to prevent a dissenting member from seeking relief under R.C. 1705.42, it must provide a reasonable basis for determining and paying the fair cash value of a dissenting member's interest. (Appellants' Brief at 44.)

{¶ 57} Dissenters' rights proceedings are statutory creations. Until the late nineteenth century, courts viewed "the relationship between shareholder and corporation as a vested property right, and the vote of a shareholder owning a single share of stock was sufficient, by the common-law rule, to block any merger, sale of major assets or other organic change." *Armstrong v. Marathon Oil Co.*, 32 Ohio St.3d 397, 402 (1987). As such, a shareholder owning a single share of stock could "frustrat[e] the will of the majority of the shareholders and block[] the desired course of the corporation." Cecile C. Edwards, *Dissenters' Rights: The Effect of Tax Liabilities on the Fair Value of Stock*, 6 DePaul Bus. L.J. 77, 83 (1994).

{¶ 58} As commerce expanded in the latter part of the nineteenth century, the common law rule of absolute unanimity was too restrictive to meet the demands of a growing economy. *Armstrong* at 402. Legislatures across the country enacted dissenter's rights statutes to allow a shareholder to dissent from a proposed change to the corporate structure, receive compensation for their shares, and exit the corporation. *Id.* The "nearly

universal remedy" was to "provide for an appraisal of the dissenting shareholders' stock, and for the corporation to purchase such stock at the appraised price." *Id*. at 403. Thus, the "ultimate goal of dissenters' rights provisions is to require that the corporation permit the shareholder to withdraw from the corporate transaction by paying the shareholder the 'fair value' of their shares." Edwards, DePaul Bus. L.J. 77, 85. *See also* Michael W. Aikem, *Comment: A Minority Shareholder's Rights in Dissension – How Does Delaware Do it and What Can Louisiana Learn?*, 50 Loy. L.Rev. 231, 236 (2004).

{¶ 59} The operating agreements gave Mission Essential the "option" or the "right" to purchase a member's interest if one of the designated scenarios occurred. Neither operating agreement contained a provision which would require the company to purchase a member's interest if the member dissented from a proposed change to the company's structure. Notably, R.C. 1705.41(F) was effective when the parties executed both the fourth and fifth operating agreements. *See Helix Elec., Inc. v. United States*, 68 Fed.Cl. 571, 584 (2005), citing *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947) (stating that courts presume "parties contract with knowledge of the law and are aware of applicable statutes and regulations when entering into [a] contract"); *Whitely v. Canton City School Dist. Bd. of Edn.*, 38 Ohio St.3d 300, 301 (1988).

{¶ 60} The trial court properly determined that the operating agreements did not provide any basis for determining and paying the fair cash value of a dissenting member's interest within the meaning of R.C. 1705.41(F). As such, the trial court did not err by granting plaintiffs' motion for partial summary judgment. Mission Essential's fifth assignment of error is overruled.

## VII. Sixth & Eighth Assignments of Error – MacMorran's Expert Opinion & Manifest Weight

{¶ 61} Mission Essential's sixth assignment of error asserts the trial court abused its discretion by admitting MacMorran's expert opinion and denying Mission Essential's objection to MacMorran's report. Mission Essential's eighth assignment of error asserts the trial court's June 23, 2022 decision was against the manifest weight of the evidence. Because Mission Essential's sixth and eighth assignments of error both address MacMorran's decision to rely on the original 2019 budget rather than the alternative 2019 budget, we address them jointly.

{¶ 62} In its objection to MacMorran's report, Mission Essential asserted that MacMorran's calculations were erroneous because he relied on the original 2019 budget. Mission Essential supported its objection with Ricker's affidavit, which stated that the alternative 2019 budget reflected the results from the company's actual 2019 budgeting process, while the original 2019 budget did not. Mission Essential asked the court to permit MacMorran to re-evaluate his opinion of fair cash value, because MacMorran "did not have much of the information presented within" Ricker's affidavit when he issued his report. (Mission Essential's Objs. at 2.) On February 11, 2022, Mission Essential submitted a brief asking the court to determine whether MacMorran's expert opinion was inadmissible under Evid.R. 702.

{¶ 63} "The determination of the admissibility of expert testimony is within the discretion of the trial court." *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, ¶ 9. Therefore, an appellate court will not reverse a trial court's decision to admit expert testimony absent an abuse of discretion. *Id. Accord Robertson v. Mt. Carmel E. Hosp.*, 10th Dist. No. 09AP-931, 2011-Ohio-2043, ¶ 27. Trial courts should generally admit expert testimony when it is relevant and when the criteria of Evid.R. 702 are satisfied. *Terry v. Caputo*, 115 Ohio St.3d 351, 2007-Ohio-5023, ¶ 23, citing *State v. Nemeth*, 82 Ohio St.3d 202, 207 (1998).

{¶ 64} Evid.R. 702 provides that a witness may testify as an expert if the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
>
> (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2) The design of the procedure, test, or experiment reliably implements the theory;

(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

{¶ 65} Mission Essential does not dispute that MacMorran's testimony concerned a subject beyond the knowledge of lay persons or that MacMorran qualified as an expert due to his specialized knowledge, skill, experience, training, and education. Rather, Mission Essential contends that MacMorran's opinion was inadmissible because, by relying on the original 2019 budget, MacMorran's valuation analysis did not yield an accurate or reliable result.

{¶ 66} Evid.R. 702(C) "imposes upon the trial court an obligation to assess both the relevance of the expert's testimony and the reliability of the expert's methodology." *State Farm Mut. Auto. Ins. Co. v. Anders*, 197 Ohio App.3d 22, 2012-Ohio-824, ¶ 37 (10th Dist.), citing *Miller v. Bike Athletic Co.*, 80 Ohio St.3d 607 (1998). A court's inquiry under Evid.R. 702(C) "must focus on whether the principles and methods the expert employed to reach his or her opinion are reliable, not whether the expert's conclusions are accurate." *Id. Accord Valentine* at ¶ 16; *Warkoczeski v. Speedway SuperAmerica, L.L.C.*, 3d Dist. No. 2-09-26, 2010-Ohio-2518, ¶ 22. *See also Levine v. Kellogg*, 10th Dist. No. 18AP-694, 2020-Ohio-1246, ¶ 67, quoting *Knott v. Revolution Software, Inc.*, 181 Ohio App.3d 519, 2009-Ohio-1191, ¶ 46 (5th Dist.) (noting that "in the context of a bench trial, reviewing courts 'afford broad leeway to the trial court in deciding the reliability of particular expert testimony' under Evid.R. 702").

{¶ 67} Mission Essential does not contend that the principles or methods MacMorran used to conduct his analysis were unreliable; rather, Mission Essential attacks only MacMorran's decision to rely on the original 2019 budget. "[W]eaknesses in the factual basis of an expert's testimony go to the weight and credibility of the expert's testimony, not to its admissibility." *State v. Polling*, 11th Dist. No. 2008-A-0071, 2010-Ohio-1155, ¶ 44, citing *Pacific Great Lakes Corp. v. Bessemer & Lake Erie RR.*, 130 Ohio App.3d 477, 503 (8th Dist.1998). However, a court may exclude expert testimony "if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner v. Isp Technologies, Inc.*, 259 F.3d 924, 929-30 (8th Cir.2001), quoting *Hose v.*

*Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir.1995). *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir.1987) (holding that "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration"); *Walker v. Soo Line RR. Co.*, 208 F.3d 581, 586-87 (7th Cir.2000); *Meterlogic, Inc. v. KLT, Inc.*, 368 F.3d 1017, 1019 (8th Cir.2004).

{¶ 68} In both his report and testimony, which we discuss further below, MacMorran set forth several, detailed reasons to support his decision to reject the alternative 2019 budget and rely on the original 2019 budget. *Compare Wallace v. Kalniz, Choksey Dental–Ralston, Inc.*, 6th Dist. No. WD-12-048, 2013-Ohio-2944, ¶ 32-33 (finding the trial court properly struck an expert's report because the expert could not "recall the basis for his calculations," admitted he "want[ed] to look at much additional information" which he did not review, and made "purely speculative assumptions" to arrive at his conclusions). Mission Essential also thoroughly cross-examined MacMorran regarding his reasons for relying on the original 2019 budget. *See Brown v. Wal-Mart Stores, Inc.*, 6th Cir. No. 98-5965 (Nov. 24, 1999) (stating that where "opposing counsel had the opportunity to cross-examine an expert witness as to a factual basis, exclusion of the testimony is generally inappropriate"). As such, any potential weaknesses in the facts underlying MacMorran's expert opinion concerned the weight and credibility of his testimony, not its admissibility. *Polling* at ¶ 44. Mission Essential fails to demonstrate the trial court abused its discretion by admitting MacMorran's expert opinion.

{¶ 69} Mission Essential further contends that the trial court clearly lost its way when it adopted MacMorran's opinion of value, because MacMorran relied on the original 2019 budget rather than the alternative 2019 budget to conduct his analysis. Mission Essential asserts that Ricker's affidavit demonstrated the alternative 2019 budget was the company's actual budget for 2019. The court reviewed MacMorran's testimony and determined that MacMorran provided a reasonable basis for excluding the alternative 2019 budget.

{¶ 70} "[I]n reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the finder of fact

clearly lost its way." *Brown v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 13AP-804, 2014-Ohio-1810, ¶ 19, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. In weighing the evidence, an appellate court " 'must always be mindful of the presumption in favor of the finder of fact.' " *Id.*, quoting *Eastley* at ¶ 21. "The rationale for this deference is that the trial court is in the best position to evaluate the evidence by viewing the witnesses and observing their demeanor, voice inflections, and gestures." *Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 12, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978).

{¶ 71} Where an expert relies on "values supplied by others, the conduct of such other persons is probative of their credibility and of the information being supplied to the expert." *Alabama By-Prods. Corp. v. Neal*, 588 A.2d 255, 258 (Del.1991). Accordingly, because Mission Essential supplied MacMorran with both the original and alternative 2019 budgets, Mission Essential's conduct regarding the two budgets "was squarely at issue in this appraisal proceeding." *Id.*

{¶ 72} In response to MacMorran's initial request for financial information in late 2020, Mission Essential produced a company budget for 2018 that contained "detail[ed] line items." (Feb. 15, 2022 Tr. at 26.) In early January 2021, MacMorran again requested financial information from Mission Essential, and specifically asked the company to produce a 2019 budget that was similar to the 2018 budget. On February 2, 2021, Mission Essential sent MacMorran the original 2019 budget. The original 2019 budget contained "detail exactly like the historical financial information in the 2018 budget." (Feb. 15, 2022 Tr. at 27.) Following an April 15, 2021 status conference, the court issued an order stating that MacMorran would submit his final report to the court no later than May 7, 2021.

{¶ 73} On April 29, 2021, Mission Essential's counsel sent MacMorran the alternative 2019 budget and informed him that "Ricker would be able to explain the differences" between the two budgets at his interview. (Feb. 15, 2022 Tr. at 27; Ex. 70.) The alternative 2019 budget reflected a net operating income of $3,052,047, while the original 2019 budget reflected a net operating income of $9,491,021. The original 2019 budget had

about "176 line items of data," while the alternative 2019 budget had "about 10 line items of data." (Feb. 15, 2022 Tr. at 28.) The company's 2018 annualized income statement had an EBITDA margin near 7 percent, the original 2019 budget had an EBITDA margin near 6 percent, and the alternative 2019 budget had an EBITDA margin of 3.6 percent. (MacMorran Report at 10.) MacMorran noted that the EBITDA margin in the alternative 2019 budget was "several percentage points below [the company's] history * * * and even below the minimum that [MacMorran saw] reflected in the market data." (Feb. 15, 2022 Tr. at 33, 177.) In contrast, the financial information in the original 2019 budget was similar to the company's historical financial information and to financial information from comparable companies. As such, MacMorran stated that the alternative 2019 budget "appeared to be an outlier." (Feb. 15, 2022 Tr. at 33.)

{¶ 74} MacMorran also explained that, while the alternative 2019 budget contained a forecast through 2024, the forecast extrapolated losses from the company's two 2018 start-up businesses "into the future, [thereby] compound[ing] that loss into the future." (Feb. 15, 2022 Tr. at 17, 39.) Thus, MacMorran noted that the alternative 2019 budget assumed the start-ups "would lose all in $800,000 a year forever," despite other information demonstrating that the start-ups began "to show profitability towards the end of their first year." (Feb. 15, 2022 Tr. at 39.)

{¶ 75} When MacMorran received the alternative 2019 budget, he asked Mission Essential to provide him with documentation "detailing [the] differences" between the two budgets. (Feb. 15, 2022 Tr. at 28.) However, Mission Essential provided "no response" to MacMorran's request for explanatory materials. (Feb. 15, 2022 Tr. at 203.) On April 29, 2021, MacMorran sent Ricker a document titled "Interview Discussion Topics," which included a chart highlighting the differences between the original and alternative 2019 budgets. (Mission Essential Objs. to MacMorran Report Ex. 3.) The discussion topics informed Ricker that, at his interview, MacMorran would ask him to "provide detail" regarding the differences between the two budgets and to "provide any board meeting minutes or other corporate documentation ratifying" the budgets. (Mission Essential Objs. to MacMorran Report Ex. 3.)

{¶ 76} At his May 5, 2021 interview, Ricker informed MacMorran that he knew the company did "multiple puts and takes across the budget every day of the year," but stated

he would "be guessing" if he tried to explain the differences between the two 2019 budgets. (Pls'. Ex. 3, Ricker Interview ("Ricker Int.") at 41.) Ricker told MacMorran that the people who could provide "commentary" regarding the two budgets were "no longer" with the company. (Ricker Int. at 58, 72.) MacMorran asked Ricker if he could explain "at a macro level" whether there were any "programs, spending or other material issues that would have [caused] a revision" to one of the budgets, but Ricker again stated that he "would be guessing" if he tried to answer MacMorran's question. (Ricker Int. at 42, 62.)

{¶ 77} In his September 13, 2021 affidavit, Ricker stated that "[a]fter [his] interview [with MacMorran], [he] undertook an investigation" to determine how the two 2019 budgets were created. (Ricker Aff. at ¶ 8-9.) Ricker incorporated by reference into his affidavit a document he described as the "2019 Budget Timeline," which demonstrated that the company conducted its first quick look review of the 2019 budget on September 28, 2018, conducted various reviews of the budget throughout October and November 2018, and published the final 2019 budget on December 20, 2018. (Ricker's Aff. at ¶ 11, Ex. C.) Ricker stated that a budget "dated January 31, 2019, [was] presented to [him] as part of the 2019 Budget Review," that the company's former controller presented a budget to him in February 2019, and that Mission Essential later provided the alternative 2019 budget to MacMorran. (Ricker Aff. at ¶ 24-26, Exs. D & E.) Ricker averred that the budgets presented to him in January and February 2019, and the alternative 2019 budget presented to MacMorran, all reflected net operating income of $3.052 million which was the "correct Net Operating Income as determined by the 2019 budgeting process." (Ricker Aff. at ¶ 24-26.)

{¶ 78} Ricker stated that the original 2019 budget was "an artificial forecast" of what the company could "achieve if all imaginable measures were taken to decrease operating expenses." (Ricker Aff. at ¶ 27.) Ricker claimed that the original 2019 budget was not created in the company's 2019 budgeting process, but was created between January and March 2019 using "knowledge from January 2019 through March 2019 regarding material events that did or did not occur during that time period." (Ricker Aff. at ¶ 28.) Ricker stated the budgets presented to him in January and February 2019 contained information that "was known and knowable to the Company in September and October 2018 when the 2019

budgeting process was well underway," while the original 2019 budget did not. (Ricker Aff. at ¶ 24-25.)

{¶ 79} Mission Essential contends that Ricker's affidavit demonstrates the original 2019 budget was not created by the company's 2019 budgeting process and did not contain information that was known or knowable as of the October 22, 2018 valuation date. As such, Mission Essential asserts that MacMorran could not rely on the original 2019 budget to conduct his valuation analysis. The trial court, however, was under no obligation to accept the statements in Ricker's affidavit as true.

{¶ 80} Ricker's affidavit did not explain why he failed to investigate the differences between the two 2019 budgets before his interview with MacMorran. Mission Essential told MacMorran that Ricker would be able to explain the differences between the budgets at his interview, and MacMorran specifically informed Ricker in the interview discussion topics that he would ask him about the differences between the two 2019 budgets at the interview. At the interview, however, Ricker did not provide any explanation for the two 2019 budgets. As Ricker's subsequent affidavit purported to explain the differences between the two budgets, MacMorran and the trial court had a firm basis on which to find Ricker's affidavit lacking credibility. *Compare Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, paragraph three of the syllabus (holding that "[a]n affidavit of a party opposing summary judgment that contradicts former deposition testimony of that party may not, without sufficient explanation, create a genuine issue of material fact to defeat the motion for summary judgment"); *Turner v. Turner*, 67 Ohio St.3d 337, 338 (1993) (stating that when a litigant's affidavit "is inconsistent with his or her earlier deposition testimony, summary judgment in that party's favor is improper because there exists a question of credibility").

{¶ 81} While Ricker averred that the budget "dated January 31, 2019, [was] presented to [him] as part of the 2019 Budget Review," the budget process timeline attached to his affidavit demonstrated that the final budget review occurred on November 20, 2018 and that the company published the final 2019 budget on December 20, 2018, not January 31, 2019. (Ricker's Aff. at ¶ 24, Ex. C.) Ricker's affidavit also demonstrated that he was involved in several steps of the 2019 budget process timeline, including the final budget review on November 20, 2018 and the final budget approval on November 21, 2018. As Ricker's affidavit indicated that he approved the company's final

2019 budget, the court could also question the credibility of Ricker's interview statements indicating he had no knowledge regarding the two 2019 budgets.

**{¶ 82}** MacMorran explained that he believed both the original and the alternative 2019 budgets contained information that was known or knowable as of the October 22, 2018 valuation date. MacMorran noted that "about 80 percent of the difference" between the two budgets concerned only three line items of data, while the remaining line items were either "exactly the same" or the "changes were de minimis." (Feb. 15, 2022 Tr. at 37-38.) Thus, "because so many of the numbers" contained in the two budgets "[were] similar," MacMorran concluded that both budgets likely "came through a similar process," i.e., the company's 2019 budgeting process that began in September 2018. (Feb. 15, 2022 Tr. at 173-74.) Although Ricker claimed that the original 2019 budget reflected "material events" which occurred from January to March 2019, Ricker did not explain what events allegedly occurred in early 2019 that impacted the original 2019 budget. (Ricker Aff. at ¶ 28.) Accordingly, MacMorran's testimony was competent, credible evidence demonstrating the original 2019 budget contained information that was known or knowable as of the October 22, 2018 valuation date.

**{¶ 83}** Mission Essential lastly contends that its audited financial statement for 2019 "confirm[ed] the accuracy" of the alternative 2019 budget. (Appellants' Brief at 68.) However, because the company's audited financial statement for 2019 was not known or knowable as of the October 22, 2018 valuation date, the trial court properly did not consider it in assessing the fair cash value of plaintiffs' membership interests.

**{¶ 84}** Having reviewed the record and weighed the evidence and the credibility of the witnesses, we find the trial court did not lose its way. MacMorran provided competent, credible testimony explaining why he found the original 2019 budget to be more reliable than the alternative 2019 budget. Indeed, MacMorran demonstrated that the original 2019 budget was detailed, consistent with the company's historical financial information, and consistent with market data, while the alternative 2019 budget lacked detail and appeared to be an outlier. *See In re Nine Sys. Corp. Shareholders Litigation*, 2014 Del. Ch. LEXIS 171 (Sept. 4, 2014), citing *Huff Fund Invest. Partnership v. CKx, Inc.*, 2013 Del. Ch. LEXIS 262 (Oct. 31, 2013) (stating that when a company's financial projections are "grossly inconsistent with the corporation's recent performance," the projections are "too unreliable

to support a credible discounted cash flow analysis"). Mission Essential's conduct with respect to the alternative 2019 budget called the credibility of the information contained in the alternative 2019 budget into question. *See Alabama By-Prods. Corp.* at 258. Similarly, the contents and timing of Ricker's affidavit gave the trial court a firm basis on which to question Ricker's credibility. Accordingly, the trial court's conclusion that MacMorran provided a reasonable basis for excluding the alternative 2019 budget was supported by the manifest weight of the evidence.

**{¶ 85}** Based on the foregoing, Mission Essential's sixth and eighth assignments of error are overruled.

## VIII.　Seventh Assignment of Error — Interest

**{¶ 86}** Mission Essential's seventh assignment of error asserts the trial court abused its discretion by awarding plaintiffs interest on the judgment at the rate of 6 percent. The trial court explained that in establishing the interest rate it "considered the profit margin percentages identified by the court-appointed appraiser on Schedule 7.1" of his report. (June 23, 2022 Decision at 12.) Schedule 7.1 of MacMorran's report contained a forecast demonstrating that the company's EBITDA margins would remain at 6 percent through 2023.

**{¶ 87}** R.C. 1705.42(A)(2) provides that after the trial court makes a finding as to the fair cash value of a dissenting member's interest, the court must "render judgment against the limited liability company for the payment of that fair cash value and interest at the rate and from the date that the court considers equitable." "[W]e review the trial court's decision as to the interest rate and the date from which the interest accrues for an abuse of discretion." *English v. Artomick, Internatl. Inc.*, 10th Dist. No. 99AP-578 (Aug. 10, 2000), citing *Armstrong*.　In setting the interest rate, a court should consider the "evidence as presented by the parties, including, but not limited to, the prevailing rate of interest for various kinds of loans, the average prime rate over that period of time and any other such evidence." *Armstrong* at 420. The statutory rate of interest stated in R.C. 1343.01 is not controlling.　*Id.* at paragraph five of the syllabus. While the trial court has wide discretion to determine the appropriate rate of interest, a court does not have the discretion to decline to award interest. *English*; *Vought v. Republic-Franklin Ins. Co.*, 117 Ohio App. 389, 392 (10th Dist.1962).

{¶ 88} Mission Essential does not challenge the trial court's general decision to rely on the company's projected EBITDA margins to support its interest rate determination. Rather, Mission Essential asserts only that the trial court abused its discretion by relying on Schedule 7.1 from MacMorran's report because MacMorran used the original 2019 budget to calculate the EBITDA margins reflected on Schedule 7.1. As discussed above, however, MacMorran properly relied on the original 2019 budget to conduct his valuation analysis. As such, Mission Essential fails to demonstrate that the trial court abused its discretion by awarding plaintiffs interest at the rate of 6 percent per annum. *See Martin v. Martin Bros. Container & Timber Prods. Corp.*, 266 F.Supp.2d 715, 717 (N.D.Ohio 2003).

{¶ 89} Based on the foregoing, Mission Essential's seventh assignment of error is overruled.

## IX. Plaintiffs' Cross-Appeal — Discounts

{¶ 90} Plaintiffs' cross-appeal asserts the trial court erred by applying discounts for lack of marketability and minority status when determining the fair cash value of their membership interests. Plaintiffs' first assignment of error contends the trial court erred as a matter of law when it applied minority and marketability discounts to assess the fair cash value of their membership interests. Plaintiffs' second assignment of error asserts the trial court abused its discretion by applying minority and marketability discounts under the facts of the present case. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore* at 219. *See also Huffman* at 87. As both assignments of error concern the trial court's decision to apply minority and marketability discounts, we review them jointly.

{¶ 91} R.C. 1705.42(B) defines the "fair cash value of a membership interest for purposes of this section" as "the amount that a willing seller who is under no compulsion to sell would be willing to accept and that a willing buyer who is under no compulsion to purchase would be willing to pay" (the "willing seller/willing buyer test"). The statute further provides that "[i]n computing the fair cash value of a membership interest, any appreciation or depreciation in market value resulting from the merger, consolidation, or conversion shall be excluded."

{¶ 92} A discount for the minority status of a membership interest adjusts "for a lack of control over the [company] on the theory that the minority [interest is] not worth the

same as the majority holdings due to the lack of voting power." *Arnaud v. Stockgrowers State Bank*, 992 P.2d 216, 218 (1999). A discount for lack of marketability "allows an appraiser to adjust for a lack of liquidity in the [membership interest] itself on the theory that there is a limited supply of purchasers of that [interest]." *Id. Accord Maughan v. Correia*, 210 Cal.App.4th 507, 520 (2012); *Charland v. Country View Golf Club*, 588 A.2d 609, 611-12 (Sup.Ct.R.I.1991).

{¶ 93} The trial court noted that plaintiffs held minority interests in Mission Essential and that ownership in Mission Essential did not trade on an active market. The court concluded, relying on *Garttman v. Picoma Industries, Inc.*, 7th Dist. No. 92-B-5 (Jan. 5, 1993); *Akron Std. Meats & Foods v. Calle*, 9th Dist. No. 10130 (Oct. 7, 1981); and *English*, that minority and marketability discounts were "appropriate tools to use in valuing" a membership interest under Ohio law. (June 23, 2022 Decision at 10.) The court noted the willing seller/willing buyer test in R.C. 1705.42(B) and found that "[n]o willing buyer who was under no compulsion to purchase would be willing to offer a pro-rata price for a minority interest such as that held by Plaintiffs unless the offer included the interest in the entire company." (June 23, 2022 Decision at 11.) The court applied minority and marketability discounts to determine the fair cash value of plaintiffs' membership interests.

{¶ 94} Plaintiffs contend that the case law analyzing former R.C. 1701.85(C) and the General Assembly's amendment of R.C. 1701.85(C) in 2012 demonstrate that courts should not apply minority and marketability discounts when assessing fair cash value under R.C. 1705.42. R.C. 1701.85 addresses dissenter's rights for corporate shareholders. From 1955 to 2012, R.C. 1701.85(C) defined the "fair cash value" of a dissenting shareholder's stock pursuant to the same willing seller/willing buyer test stated in R.C. 1705.42(B) and did not mention minority or marketability discounts. *See Armstrong* at 406.

{¶ 95} In *Vought*, this court held that the willing seller/willing buyer test in R.C. 1701.85(C) contemplated a "hypothetical-market-value standard." *Vought* at paragraph one of the syllabus. The court explained that the hypothetical-market-value standard "permit[ted] evidence to be introduced as to any factor which a reasonable man would take into consideration in determining value." *Vought* at 391. In *Calle*, the Ninth District Court of Appeals followed *Vought*, and concluded that a court could apply minority and marketability discounts when assessing fair cash value under R.C. 1701.85(C) because "a

prospective buyer would not be willing to pay as much for [minority shares in a closely held corporation] as might otherwise be the case." *Id.*

{¶ 96} In *Armstrong*, the court held that the willing seller/willing buyer test in R.C. 1701.85(C) was a "market value definition," and that evidence of actual market activity should be accorded the "greatest significance and weight" under the test. *Id.* at 411. The court further held that, if there was no actual market activity, a trial court could apply the "hypothetical market valuation[]" and consider "all acceptable accounting principles including asset value, capitalization of earnings, dividend returns, management, potential growth of corporate endeavor or product, as well as other acceptable criteria" to determine the fair cash value of the stock. *Id.* The *Armstrong* court also noted that the determination under R.C. 1701.85(C) concerned only those "shares held by the dissenting shareholders" and not the value of " 'all or substantially all' of the shares of the corporation." *Id.*   In *Garttman*, the court reviewed *Armstrong* and concluded that "[m]arketability must therefore be considered when a court seeks to value the specific shares owned by a dissenter," because ignoring the stock's lack of marketability could "artificially increase the value of shares for which there may not be a market." *Garttman.*

{¶ 97} In *English*, this court found the trial court properly applied minority and marketability discounts when assessing the fair cash value of a dissenting shareholder's stock under R.C. 1701.85(C). The court explained that the minority status or lack of marketability of the shares were factors "that a reasonable person would consider in determining the value of the stock." *English*, citing *Calle*. The dissenting shareholder in *English* argued that applying minority and marketability discounts was contrary to the public policy of protecting dissenting shareholders. However, the *English* court found the case law the dissenting shareholder relied on to support his public policy argument "distinguishable," because the cases were "from foreign jurisdictions where statutory law provides that a dissenting shareholder is entitled to the 'fair value' of his or her shares." *English.*

{¶ 98} Effective May 4, 2012, the General Assembly amended R.C. 1701.85(C) pursuant to 2011 Sub.H.B. No. 48. The amendment did not alter the willing seller/willing buyer test as the definition of fair cash value, but added a provision "exclud[ing]" any "discount for lack of marketability or minority status" from the calculation of fair cash

value. R.C. 1701.85(C)(1)(b). The General Assembly has not added a similar exclusion to the fair cash value definition in R.C. 1705.42(B). The General Assembly also has not excluded minority or marketability discounts from the assessment of the fair cash value of a dissenting limited partner's interest under R.C. 1782.437(B) or a dissenting partner's interest under R.C. 1776.78(C). R.C. 1782.437(B) and 1776.78(C) also define "fair cash value" pursuant to the willing seller/willing buyer test.

{¶ 99} Statutes relating to the same general subject matter are to be read in pari materia in order to determine legislative intent. *Sheet Metal Workers' Internatl. Assn., Local Union No. 33 v. Gene's Refrigeration Heating & Air Conditioning, Inc.*, 122 Ohio St.3d 248, 2009-Ohio-2747, ¶ 38. In reading such statutes in pari materia, and construing them together, a court must give such a reasonable construction as to give the proper force and effect to each and all such statutes. *Johnson's Mkts., Inc. v. New Carlisle Dept. of Health*, 58 Ohio St.3d 28, 35 (1991). *See Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, ¶ 24, quoting *State v. Moaning,* 76 Ohio St.3d 126, 128 (1996) (stating that it is " 'a well-settled rule of statutory interpretation that statutory provisions be construed together and [that] the Revised Code be read as an interrelated body of law' ").

{¶ 100} Furthermore, "the General Assembly, in enacting a statute, is assumed to have been aware of other statutory provisions concerning the subject matter of the enactment even if they are found in separate sections of the Code." *Meeks v. Papadopulos*, 62 Ohio St.2d 187, 191-92 (1980), citing *State ex rel. Darby v. Hadaway*, 113 Ohio St. 658 (1925). "[T]he General Assembly's use of particular language to modify one part of a statute but not another part demonstrates that the General Assembly knows how to make that modification and has chosen not to make that modification in the latter part of the statute." *Hulsmeyer v. Hospice of Southwest Ohio*, *Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, ¶ 26. *Accord Davis v. Gallagher*, 951 F.3d 743, 751 (6th Cir.2020), citing *Central Bank of Denver, N.A. v. First Interstate Bank of Denver*, *N.A.*, 511 U.S. 164, 176-77 (1994) (stating that "when Congress omits language from one statute that it included in another similar statute, courts give that choice meaning").

{¶ 101} Construing the Ohio dissenters' rights statutes together, it is apparent that the General Assembly knows how to expressly exclude minority and marketability discounts from the assessment of fair cash value and that it chose not to exclude such

discounts from the fair cash value assessments under R.C. 1705.42, 1782.437, and 1776.78. Plaintiffs contend that the General Assembly "presumably" did not amend R.C. 1705.42(B) because no court had interpreted R.C. 1705.42(B) as permitting minority and marketability discounts. (Cross-Appellants' Brief at 23.) While there is no case law analyzing R.C. 1705.42(B), the statute defines "fair cash value" using the same willing seller/willing buyer test contained in former R.C. 1701.85(C). The 2012 amendment to R.C. 1701.85(C) has prospective application, and therefore does not necessarily indicate that *Calle*, *Garttman*, and *English* were wrongly decided under the applicable law at the time. *See Harbour v. Ridgeway*, 10th Dist. No. 04AP-350, 2005-Ohio-2643, ¶ 17, citing R.C. 1.48. Accordingly, *Calle*, *Garttman*, and *English* demonstrate that a court may consider minority and marketability discounts under the willing seller/willing buyer test in R.C. 1705.42(B), 1782.437(B), and 1776.78(C).

{¶ 102} Plaintiffs essentially ask us to presume the General Assembly intended to expressly exclude minority and marketability discounts from the fair cash value determination under R.C. 1705.42(B), despite the fact the General Assembly did not include language to such effect in the statute. We decline to presume such imprecision on the part of the General Assembly. *See Rosette v. Countrywide Home Loans, Inc.*, 105 Ohio St.3d 296, 2005-Ohio-1736, ¶ 14 (noting that to presume "the legislature meant 'penalty' or 'forfeiture' when it used the term 'damages' is to presume imprecision on the part of the General Assembly," which a court should "decline" to do); *Hulsmeyer* at ¶ 26 (stating that if the General Assembly "could have used a particular word in a statute but did not, we will not add that word by judicial fiat"). Accordingly, the 2012 amendment to R.C. 1701.85(C) does not demonstrate that a trial court may not apply minority or marketability discounts when assessing the fair cash value of a dissenting member's interest under R.C. 1705.42(B).

{¶ 103} However, the fact that a court could apply minority and marketability discounts when assessing fair cash value under R.C. 1705.42(B) does not result in the conclusion that the court should have applied them in the present case. Plaintiffs note that, after Mission Essential pays plaintiffs the fair cash value of their membership interests, Greg Miller will become the sole 100 percent owner of Mission Essential. As such, plaintiffs contend that discounting their interests will result only in a windfall to Greg Miller.

{¶ 104} The majority of courts which have considered the issue have found minority and marketability discounts to be inappropriate when assessing the value of a dissenting shareholder's shares. *See Lawson Mardon Wheaton v. Smith*, 160 N.J. 383, 401 (1999) (finding that "equitable considerations have led the majority of states and commentators to conclude that marketability and minority discounts should not be applied when determining the fair value of dissenting shareholders' stock in an appraisal action"); *MT Properties, Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383, 388 (Minn.App.1992) (stating that prohibiting minority discounts was "in accord with the approach of the majority of states which have addressed this issue"); *Swope v. Siegel-Robert, Inc.*, 243 F.3d 486, 493 (8th Cir.2001). Courts which have found minority and marketability discounts to be appropriate generally hold that whether to apply such discounts is within the trial court's discretion. *See Atlantic States Constr., Inc. v. Beavers*, 169 Ga.App. 584, 589-90 (1984) (stating that the trial court could "determine from the evidence whether [either a minority or marketability discount] ha[d] any bearing on the stock's fair value," but that the court should exercise "caution" when applying such discounts); *Stanton v. Republic Bank of S. Chicago*, 144 Ill.2d 472, 480 (1991) (finding that the trial court "acted within its discretion to apply [minority and marketability] discounts, even though [it was] not required to [apply such discounts]"); *Ybarra v. Dominguez Family Ents.*, 521 P.3d 834, 838 (Or.2022) (finding the "application of a minority discount [in a dissenters' rights proceeding to be] a case-specific determination").

{¶ 105} However, courts have found minority and marketability discounts particularly inappropriate where a remaining majority shareholder will have their interest in the corporation increase as a result of the dissenters' rights proceeding. *See Hansen v. 75 Ranch Co.*, 957 P.2d 32, 41 (Mont.1998) (holding that because a "sale" of the dissenting shareholder's stock "to a majority shareholder or to the corporation simply consolidates or increases the interests of those already in control," applying a discount to the transfer would "result in a windfall to the transferee"); *First W. Bank Wall v. Olsen*, 621 N.W.2d 611, 619 (S.D.2001) (finding minority and marketability discounts inapplicable to the assessment of the fair value of the dissenting shareholder's shares, because the transferee would be either the "majority shareholder or the corporation itself" and, "rather than lacking control, the transferee [would] have increased control over the affairs of the corporation"); *Brown v.*

*Allied Corrugated Box Co.*, 91 Cal.App.3d 477, 486 (1979) (explaining that a minority discount "had little validity when the shares are to be purchased by someone who is already in control of the corporation," because "[i]n such a situation, it can hardly be said that the shares are worth less to the purchaser because they are noncontrolling"); *Arnaud v. Stockgrowers State Bank*, 268 Kan. 163, 169 (1999); *Wenzel v. Hopper & Galliher, P.C.*, 779 N.E.2d 30, 38-39 (Ind.2002); *Columbia Mgt. Co. v. Wyss*, 765 P.2d 207 (Or.1988); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del.1989).

{¶ 106} Mission Essential contends that the out-of-state cases finding minority and marketability discounts to be inappropriate are inapplicable herein because the dissenters' rights statutes in those cases provided that the dissenting shareholder would receive the "fair value" of their shares. (Cross-Appellees' Brief at 33-37.) *See* Edwards, 6 DePaul Bus. L.J. 77, 86, fns. 45, 46, 47 (noting that "a survey of state [dissenter's rights] statutes indicates that dissenters are to receive 'fair value' in most states, 'fair cash' in others, and 'fair market value' in still others," but identifying Ohio as the only state that provides dissenters with fair cash value). Mission Essential notes that in *English* this court stated that " 'fair value [was] far different from the "fair cash value" concept.' " *English*, citing *MT Properties*. (Cross-Appellees' Brief at 20.) However, *English* did not analyze these terms or explain the differences between them. *MT Properties* which *English* relied on, does not address "fair cash value" or contain any statement finding that "fair value" differs from "fair cash value." Mission Essential also contends that, because R.C. 1705.42(B) defines fair cash value pursuant to the willing seller/willing buyer test, fair cash value is "synonymous" with fair market value. (Appellants' Brief at 44.) We disagree.

{¶ 107} Fair market value is defined as the "price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction; the point at which supply and demand intersect." *Black's* at 1785. "Fair cash value" has the same definition as "fair value," which is the "estimate of a good, service, or asset's potential price, based on a rational and unbiased assessment of the amount at which it could currently be bought and sold between willing parties." *Black's* at 1785, 715. The fair value definition further states that fair value is "often used when a fair market value is unavailable, [usually] because there is no active market for the item," and that the "fair value of a dissenting shareholder's stock is generally determined without applying the marketability or minority

discounts that would apply in a fair-market-value determination." *Black's* at 1785. *See Conti v. Christoff*, 7th Dist. No. 99 CA 84 (Oct. 2, 2001), citing R.C. 1782.35 (finding that "fair value" and "fair cash value" both contemplate the payment of "fair value"); *Wenzel* at 38, quoting *HMO-W, Inc. v. SSM Health Care Sys.*, 611 N.W.2d 250, 255 (2000), fn.5 (stating that fair value " 'carries with it the statutory purpose that shareholders be fairly compensated,' " and thus differs from fair market value which "represents 'the amount for which property will sell upon negotiations in the open market' "). *See also Thomas v. Logue*, 10th Dist. No. 21AP-385, 2022-Ohio-1603, ¶ 15 (stating that "[i]n giving words their common, everyday meaning, it is common for a court to rely on dictionary definitions").

{¶ 108} However, market value is an appropriate consideration when assessing the fair value of a dissenting shareholder's stock. *See Wyss* at 202 (explaining that while " 'fair value' does *not* mean 'fair market value,' " market value is "one factor in determining fair value") (Emphasis sic.); *Beavers* at 587 (stating that while " 'fair value' of stock is merely its intrinsic worth after consideration of all relevant factors," market value is "a factor that clearly will be relevant in the determination of 'fair value' "). Courts have found that a trial court has discretion to apply minority and marketability discounts even when assessing the "fair value" of a dissenting shareholder's stock. *See Beavers* at 586, 589; *Stanton* at 475, 480. *Compare Conti.*

{¶ 109} At the February 15, 2022 hearing, MacMorran explained that the R.C. 1705.42(B) definition of fair cash value "ha[d] elements of both the fair market value standard and certain elements of what [he would] call a fair value standard." (Feb. 15, 2022 Tr. at 11-12.) We agree with MacMorran's assessment. Had the General Assembly intended to provide dissenting member's solely with the fair market value of their membership interest, the General Assembly would have chosen words to that effect. *See In re Application of Columbus S. Power Co.*, 138 Ohio St.3d 448, 2014-Ohio-462, ¶ 26. However, the willing seller/willing buyer test is a market value definition. *Armstrong* at 411. Accordingly, we find that the definition of fair cash value in R.C. 1705.42(B) has elements of both the fair market value standard and the fair value standard. As such, the out-of-state cases finding minority and marketability discounts to be inappropriate when assessing the fair value of a dissenting shareholder's shares have some persuasive authority in the present case.

{¶ 110} To assess the "fair cash value" of a dissenting member's interest under R.C. 1705.42(B) courts must utilize the market-based willing seller/willing buyer test to determine the amount which will fairly compensate the dissenting member.  Courts should rely on actual market evidence if available and, if no actual market evidence exists, courts may consider "any factor which a reasonable [person] would take into consideration," including "all acceptable accounting principles * * * as well as other acceptable criteria." *Vought* at 391; *Armstrong* at 411. Thus, depending on the evidence presented, the minority status or illiquid nature of a membership interest may or may not be relevant factors.

{¶ 111} The trial court found that no willing buyer would offer a pro-rata price for plaintiffs' minority interests in Mission Essential "unless the offer included the interest in the entire company." (June 23, 2022 Decision at 11.) However, the "offer" in the present case does include the entire company. Because plaintiffs and Greg Miller were the only remaining members of Mission Essential, at the conclusion of the present dissenters' rights proceeding Greg Miller will become the sole 100 percent owner of Mission Essential.  Greg Miller will not acquire a minority interest in a company which lacks control, and his 100 percent interest in the company will not suffer from a lack of marketability. Thus, applying minority and marketability discounts to the fair cash value of plaintiffs' membership interests results only in a windfall to Greg Miller, who will gain total control over the company following the transfer.  Accordingly, we agree with plaintiffs' contention that it was inappropriate for the trial court to apply minority and marketability discounts to determine the fair cash value of their membership interests in the present case.

{¶ 112} Based on the foregoing, we overrule plaintiffs' first cross-assignment of error and sustain plaintiffs' second cross-assignment of error.  As such, we reverse the portion of the trial court's June 24, 2022 decision and entry which found minority and marketability discounts appropriate in the present case. We remand for the trial court to remove the minority and marketability discounts from the court's assessment of the fair cash value of plaintiffs' membership interests and to enter judgment against Mission Essential accordingly.

## X. Conclusion

{¶ 113} Having overruled plaintiffs' first cross-assignment of error and Mission Essential's eight assignments of error, but having sustained plaintiffs' second cross-

assignment of error, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas and remand the matter to that court for proceedings consistent with law and this decision.

*Judgment affirmed in part,*
*and reversed in part; cause remanded.*

BEATTY BLUNT, P.J., and JAMISON, J., concur.

_____